GROUP OF INSTITUTIONAL INVESTORS ET AL. *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO.*

No. 11. Argued October 14, 15, 1942.—Decided March 15, 1943.

---

*Together with No. 12, *Group of Institutional Investors et al.* v. *Union Trust Co. et al.;* No. 13, *Group of Institutional Investors et al.* v. *Abrams et al.;* No. 14, *Group of Institutional Investors et al.* v. *Orton et al.;* No. 15, *Group of Institutional Investors et al.* v. *Guaranty Trust Co. of New York et al.;* No. 16, *Group of Institutional Investors et al.* v. *Chicago, Terre Haute & Southeastern Ry. Co. et al.;* No. 17, *Group of Institutional Investors et al.* v. *United States Trust Co. of New York, Trustee;* No. 18, *Group of Institutional Investors et al.* v. *Trustees of Princeton University et al.;* No. 19, *Group of Institutional Investors et al.* v. *Glines et al.;* and No. 32, *Reconstruction Finance Corporation* v. *Chicago, Milwaukee, St. Paul & Pacific Railroad Co. et al.,* also on writs of certiorari, 316 U. S. 659, to the Circuit Court of Appeals for the Seventh Circuit.

*Messrs. Kenneth F. Burgess* and *Fred N. Oliver* (with whom *Messrs. Douglas F. Smith* and *Willard P. Scott* were on the brief) for Group of Institutional Investors and Mutual Savings Bank Group, respectively, petitioners in Nos. 11 to 19, inclusive. *Mr. Russell L. Snodgrass,* with whom *Solicitor General Fahy* and *Mr. Emmet McCaffery* were on the brief, for Reconstruction Finance Corporation, petitioner in No. 32.

*Mr. A. N. Whitlock* for Henry A. Scandrett et al., Trustees, Chicago, M., St. P. & P. R. Co.; *Mr. John L. Hall,* with whom *Messrs. Frank C. Nicodemus, Jr., James Garfield,* and *Charles P. Curtis, Jr.,* were on the brief, for Chicago, M., St. P. & P. R. Co.; *Mr. Albert K. Orschel,*

528

with whom *Mr. Edward R. Johnston* was on the brief, for Protective Committee of Holders of Preferred Stock; *Mr. M'Cready Sykes,* with whom *Mr. George L. Shearer* was on the brief, for United States Trust Co., Trustee; *Mr. Frederick J. Moses* for "University Group" of General Mortgage Bondholders; *Messrs. Edwin S. S. Sunderland* and *C. Frank Reavis* (with whom *Messrs. Malcolm Fooshee* and *Henry F. Tenney* were on the brief) for Fifty-Year Mortgage Trustees and Protective Committee for Fifty-Year Mortgage Bonds, respectively; *Mr. Meyer Abrams* for Adjustment Mortgage Bondholders; *Mr. Thomas S. McPheeters* for Gary First Mortgage Group; and *Messrs. Reese D. Alsop* and *Ernest S. Ballard* (with whom *Messrs. Carl Meyer, Donald M. Graham, Frederick Secord, Charles Myers, Robert V. Massey, Jr., W. F. Peter, William A. McSwain,* and *Edwin H. Cassels* were on the brief) for Chicago, Terre Haute & Southeastern Ry. Co. First Lien Bondholders Committee and Massachusetts Mutual Life Ins. Co. et al., respectively,—respondents.

Appearances were entered by *Mr. Thomas O'G. Fitz Gibbon* for Guaranty Trust Co. et al., Trustees; by *Messrs. John B. Marsh* and *Edward E. Watts, Jr.,* for City Bank Farmers Trust Co., Trustee; and by *Mr. Frederic Burnham* for Continental Illinois National Bank & Trust Co., Trustee,—respondents.

*Solicitor General Fahy* and *Mr. Daniel W. Knowlton* filed a memorandum on behalf of the Interstate Commerce Commission as *amicus curiae. Messrs. John L. Hall, James Garfield,* and *Charles P. Curtis, Jr.,* on behalf of the Chicago, Rock Island & Pacific Ry. Co. et al.; and *Mr. William V. Hodges,* also filed briefs as *amici curiae.*

Mr. Justice Douglas delivered the opinion of the Court.

These cases are companion cases to *Ecker* v. *Western Pacific R. Corp., ante,* p. 448, and are here on writs of certiorari to the Circuit Court of Appeals for the Seventh Circuit. They involve numerous questions relating to a plan of reorganization for the Chicago, Milwaukee, St. Paul & Pacific Railroad Co., formulated in proceedings under § 77 of the Bankruptcy Act. 49 Stat. 911, 11 U. S. C. § 205. The plan was approved by the Interstate Commerce Commission (239 I. C. C. 485, 240 I. C. C. 257) and certified to the District Court. After a hearing and the taking of additional evidence, the District Court approved the plan with certain minor modifications not material here. 36 F. Supp. 193. The Circuit Court of Appeals reversed the order of the District Court (124 F. 2d 754) on the ground that the Commission did not make the findings required by *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510.

The debtor filed its petition under § 77 in 1935. Hearings on proposed plans were closed in 1938. The plan of reorganization here in issue was approved by the Commission in 1940. It reduced the capitalization and the fixed charges, eliminated the old stock, and substituted system mortgages for so-called divisional mortgages. Its effective date was January 1, 1939. The total debt (including interest accrued to December 31, 1938) was approximately $627,000,000. In addition the debtor had $119,307,300 of preferred stock and 1,174,060 shares of no-par value common stock outstanding. The claims against the debtor which were dealt with by the plan [1] are as follows: The Re-

---

[1] Equipment obligations totalling $33,322,999 and a note of the trustees for $1,184,000 were undisturbed or extended.

construction Finance Corporation has a claim for loans totalling about $12,000,000, secured as hereinafter described. There are General Mortgage bonds outstanding in the hands of the public in the principal amount of $138,788,000 with accrued and unpaid interest of over $17,500,000. These bonds, bearing interest at various rates from $3\frac{1}{2}$ to $4\frac{3}{4}$ per cent, have a first lien generally on the debtor's lines east of the Missouri River. In addition to the amount of these bonds publicly held, $11,212,000 principal amount are held by the Reconstruction Finance Corporation as security for its loans. There are $8,923,000 First and Refunding bonds outstanding, all of which are held by the Reconstruction Finance Corporation as security for its loans and claims. These bonds have a first lien generally on the lines west of the Missouri and a second lien on the lines east. There are $106,395,096 principal amount of 50-year bonds outstanding, with accrued and unpaid interest of $20,835,706. These bonds, subject only to the First and Refunding bonds, have a prior lien on the lines west of the Missouri; and they have a lien subordinate to the General Mortgage and the First and Refunding bonds on the lines east. They carry interest at the rate of 5%. There are also 5% Convertible Adjustment bonds outstanding in a principal amount of $182,873,693, with accrued and unpaid interest of $79,550,055. These bonds have the most junior lien on both the lines west and east of the Missouri River. In addition to those four main mortgages, the debtor had assumed liability on the mortgage indebtedness of other companies which it or its predecessor had either purchased or leased. Among these was the Milwaukee & Northern Railroad Co., which had two bond issues: the First Mortgage $4\frac{1}{2}$s in the principal amount outstanding of $2,117,000 and accrued and unpaid interest of $103,204, which were secured by a first lien on 110 miles of line south of Green Bay, Wisconsin; and Consolidated Mortgage $4\frac{1}{2}$s in the principal amount outstanding of $5,072,000 and accrued and unpaid interest of $247,260,

which were secured by a first lien on 286 miles of line north of Green Bay and by a second lien on the line south of that place. There is also in this group a $3,000,000 amount outstanding of First Mortgage 5s of Chicago, Milwaukee & Gary Ry. Co., with accrued and unpaid interest of $562,500. They were secured by a first lien on some 80 miles of portions of track around the Chicago district.

In addition there is $301,000 principal amount of Bellingham Bay & British Columbia Railroad Co. First Mortgage bonds, owned by the debtor and pledged with the Reconstruction Finance Corporation as security for its loans. Furthermore, there are four bond issues of the Chicago, Terre Haute & Southeastern Ry. Co. and its subsidiaries. These are in the principal amount outstanding of $21,-929,000, are secured by liens on lines and trackage rights in Indiana and Illinois, and carry either 4% or 5% interest. The debtor operates the lines of the Terre Haute under a 999 year lease executed in 1921, under which the lessee agreed to maintain and replace equipment, pay interest on and the principal of the lessor's bonds and to pay specified annual expenses.[2] The annual rental consists of interest on the Terre Haute bonds, taxes, and the expense of maintaining the corporate existence of the lessor.

The plan approved by the Commission provides for two system mortgages. One is a new First Mortgage [3] which

---

[2] The debtor also owns 97% of the stock of the Terre Haute which it acquired by purchase. The stock is entitled to 41,730 votes and the holders of certain Terre Haute bonds are entitled under the terms of the mortgage to 63,360 votes.

[3] The bonds secured by this mortgage are unlimited in authorized principal amount, and, subject to limitations and restrictions specified in the mortgage, may be issued from time to time in different series at various interest rates, etc. as the board of directors and the Commission may approve. In addition to the amount of these bonds issued in the reorganization to security holders, it is contemplated that not exceeding $10,000,000 principal amount of them will be issued in the reorganization to provide for reorganization expenses, working capital, and additions and betterments.

will be a first lien on all properties of the debtor, subject only to the lien of equipment obligations, and under which $58,923,171 principal amount of new First Mortgage 4% bonds will be issued in the reorganization. The second is a new General Mortgage which will be a lien on the properties of the debtor subject to the lien of the First Mortgage, and under which two series of bonds bearing 4½% interest contingent on earnings will be issued. Series A bonds will be issued in the principal amount of $57,256,669, and Series B bonds in the principal amount of $51,422,111. The interest on both Series A and Series B bonds is cumulative to the maximum amount at any one time of 13½%, but the interest on Series A bonds has priority to the interest on the Series B.[4] The plan provides for the issuance of $111,347,846 of 5% preferred stock and 2,131,475¼ shares of no-par value common stock.[5] As respects the Terre Haute properties, the plan

---

[4] The bonds secured by this mortgage are unlimited in authorized principal amount, and, subject to limitations and restrictions contained in the mortgage, may be issued from time to time in different series at various interest rates, etc., as the board of directors and the Commission may approve. Interest on any new series does not have priority over Series A or Series B. Bonds of Series B are convertible into common stock at the option of the holder at any time at the rate for each $1000 bond, of 10 shares of common stock. Both Series A and B are entitled to a sinking fund created by an annual payment out of available net income of an amount equal to ½ of 1% of the aggregate principal amount of Series A and Series B bonds authenticated and delivered.

[5] The new preferred and new common stock are authorized in an unlimited amount. Additional amounts are issuable with approval of the Commission. The shares of preferred issuable in the reorganization are Series A. So long as any shares of Series A are outstanding, the consent of at least two-thirds in number of those shares is necessary for the issuance of any additional shares of preferred ranking either as to dividends or as to liquidation, in priority to or on a parity with the shares of Series A. The dividends on Series A of the preferred are non-cumulative. But no dividends are payable on the common un-

provides for the execution of a new lease between the Terre Haute and the new company on condition that substantially all of the Terre Haute bondholders agree to a modification of their bonds and mortgages. The modifications include an extension of the maturity of the bonds, a waiver of equipment vacancies under the existing mortgages, a provision for the abandonment of lines, and reduction of the interest on the bonds so that there is fixed interest of 2.75% and contingent interest of 1.5%, the payment of the latter being subject to the same limitations as the interest on the Series A, General Mortgage bonds. In case substantially all of the Terre Haute bondholders agree to the modifications, a new lease will be made under which the new company will assume the payment of the principal of, and the interest on, the modified bonds and the corporate expenses of the Terre Haute. If substantially all of the Terre Haute bondholders do not agree to the modifications, the Terre Haute lease will be rejected as of the date when the court determines that the modifications have not been approved. In case of such disaffirmance of the lease, the plan reserves, as we discuss hereafter, 15,837 shares of new common stock for certain

---

less there shall have been paid or set apart for payment on the Series A preferred dividends at the rate of 5% per annum for the three consecutive income periods immediately preceding. Series A of the preferred participates with the common to the extent of $1 a share after dividends shall have been paid or set apart for the common at the rate of $3.50 a share. Series A preferred has voting rights and, voting cumulatively as a class, is entitled to elect a majority of the board until full 5% dividends shall have been paid on the Series A for three consecutive, calendar years. Thereafter, each share of Series A votes equally with each share of common, until full dividends have not been paid during three consecutive calendar years in which event the Series A again becomes entitled to elect a majority of the board.

Each share of common stock carries one vote. Approximately 514,221 shares are reserved for the conversion of Series B, General Mortgage bonds.

unsecured claims and the claims which would then arise under the lease. The plan also calls for the establishment of an additions and betterments fund to which $2,500,000 annually would be paid. This annual charge is placed ahead of contingent interest. It is further provided that the board of directors may set aside certain additional amounts for that fund after the payment of full interest on the Series A, General Mortgage bonds and the modified Terre Haute bonds. The plan thus authorizes a capitalization of $548,533,321 for the new company,[6] the percentage of debt to total capitalization being 40.8. The annual charges ahead of dividends, including fixed and contingent interest, the mandatory payment to the additions and betterments fund, and the sinking fund, are approximately $12,532,528. When dividends on the new preferred stock are included, the annual charges ahead of dividends on the common stock are about $18,099,920.

The Commission allocated new First Mortgage bonds to the Reconstruction Finance Corporation for 100% of its claim, after reducing the amount of the claim by certain cash credits. We have already noted the offer which it made to the Terre Haute bondholders. The Milwaukee & Northern First Mortgage bonds were to receive 70% of their claims in First Mortgage bonds and 30% in Series A, General Mortgage bonds. The Milwaukee & Northern Consolidated Mortgage bonds were to be offered 25% of their claims in First Mortgage bonds, 35% in

---

[6] This total includes the modified bonds of the Terre Haute, which though strictly not a part of the capital structure of the new company will be assumed by it, if the terms of modification are accepted. The total capitalization is made up of the following:

| | |
|---|---|
| Debt—fixed interest | $108,780,470 |
| Debt—contingent interest | 115,257,480 |
| Preferred stock | 111,347,846 |
| No-par common stock ($100 per share) | 213,147,525 |

Series A and 20% in Series B, General Mortgage bonds, and 20% in preferred stock. The same participation was afforded holders of the old General Mortgage bonds. The old 50-year bonds were to receive 15% of their claims in Series B, General Mortgage bonds, 60% in preferred stock and 25% in common stock. The Gary First Mortgage bonds were to receive 75% of the amount of their claims in new preferred stock and 25% in new common. The Convertible Adjustment bonds were allotted 1,749,492 shares of common stock for their claim upon the mortgaged assets of the debtor. The Commission noted that the allotment of stock, taken at $100 a share, would fail to satisfy the claim [7] of those bondholders by $55,471,653. For that portion of their claim, the bondholders were permitted to participate with other unsecured creditors in the debtor's free assets. 55,000 shares of common stock were set aside as representing "a fair proportion of the equity of the new company for the unmortgaged assets of the debtor." Of these 55,000 shares, the Convertible Adjustment bondholders were allotted 39,163 shares. Unsecured creditors with claims amounting to $445,162 and the Terre Haute in case of rejection of the lease were allotted the balance—or 15,837 shares. The Commission found that "the equity of the holders of the debtor's preferred stock and its common stock has no value" and that therefore they were not entitled to participation in the plan under the rule of *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106. See § 77 (e).

[7] The Commission computed the amount of the claim by taking the principal and interest to June 29, 1935, the date of the filing of the petition. That amount was $230,420,853. As we discuss hereafter, it concluded that no allowance should be made in the plan for interest on these bonds subsequent to the date of the filing of the petition in view of the insufficiency of the mortgaged assets to meet the claims and the apparent inadequacy of the free assets to satisfy the deficiency with interest.

We need not stop to discuss the respective functions of the Commission and the District Court in respect to plans of reorganization under § 77. That matter has been fully explored in the *Western Pacific* case, *ante*, p. 448. Against the background of the conclusions there reached, we come to the various objections to the plan, pressed on the courts below and renewed here.

*Exclusion of the Stockholders.* The objections of the debtor and the preferred stockholders are, in the main, that the findings of the Commission are inadequate; that it did not employ proper criteria in determining the capitalization of the new company and in concluding that there was no equity for the stockholders; and that, however proper the findings of the Commission on this phase of the case may have been when made, the earnings in 1940, 1941, and 1942 demonstrate that the earning power of the road exceeds that which the Commission found.

In determining the permissible capitalization of the new company and the nature of its capital structure, the Commission made an extensive review of the properties, business, and earnings of the debtor. It reviewed freight and total revenues, passenger revenues and their trend, operating revenues and expenses, and maintenance and efficiency of operation for various periods ending in 1938. It gave consideration to estimated future taxes, emergency freight charges, and certain wage factors. It reviewed the amounts of income available for payment of interest in each of the years from 1921 to 1938. It considered the original cost of the properties, the cost of reproduction new, the cost of reproduction less depreciation, and the value for rate making purposes—each of which was substantially in excess of the capitalization which it authorized. It stated that its obligation was "to devise a plan that will serve as a basis for the company's financial structure for the indefinite future." It concluded that a

capitalization not exceeding $548,533,321 was "as high as can reasonably be adopted" after consideration was given to "the past and prospective earnings of the debtor and all other relevant facts." It stated that the fixed interest plus the mandatory payment to the additions and betterments fund should be kept "within the coverage of past average earnings"; that those totals provided in the plan would be covered 1.16 times by the average earnings from 1931 to 1935, and 1.18 times for the period from 1932 to 1936, though they would not have been covered in 1932, 1935 and 1938. It noted that while the year 1939 showed an improvement in earning power, it would regard any increase in fixed charges "as hazardous." It said that a "reasonable margin above fixed charges operates not only to the advantage of the company in times of depressed earnings but also to the benefit of the holders of contingent interest bonds and to the marketability of all classes of the securities." Accordingly, it found that the limitation of fixed interest to $4,269,654 a year was "reasonable and proper" having regard to "the clear demands of a conservative policy in the present reorganization and the claims and rights of the first-lien bondholders" and that there would be "adequate coverage" of the amount of fixed charges provided in the plan "by the probable earnings available for the payment thereof." Furthermore, it stated that the total debt should "bear a proper relation to the total capitalization, and such as to make the payment of contingent interest a probability and of dividends a reasonable prospect, at least on the preferred stock." It concluded that in view of the charges ahead of the preferred stock and the earnings record, it would be "entirely unsound" to increase the amount of the contingent interest debt. As we have noted, the Commission found that the present preferred and common stock have "no value." And the District

Court affirmed that finding, as was necessary if the stock were to be excluded from participation in the plan.[8] As a basis for that finding the Commission noted that, although the original cost and reproduction cost was much higher than the permissible capitalization which it authorized, the earning power of the system did not justify inclusion of the old stock. It said that no dividends had been paid on the stock since 1917, that estimated future "normal earnings" were $15,894,000 a year, and that when "these amounts are compared with the annual interest charges on the principal of the present debt, $23,739,000 a year, it is evident that the earning power of the system since the period of peak earnings [1928–1929] is entirely inadequate to cover the principal of the debt, disregarding more than $118,000,000 of unpaid interest." It added that there was "no evidence whatever" to indicate that a recovery of earning power of the peak periods was "reasonably probable," but that it was "a remote possibility only, which may not be utilized to support a finding" that the stock has "an equity." It also found that, "under all pertinent facts and considerations, the probabilities of the property earning sufficient to pay dividends on any securities that could properly be represented by warrants issued under the plan are too remote to justify provision in the plan for such warrants," even though the warrants provided for their exercise on payment of cash.

Sec. 77 (d) requires the Commission when it renders a report on a plan of reorganization to "state fully the reasons for its conclusions." The summary which we have made on this phase of the case plainly shows that the

---

[8] Sec. 77 (e) provides that it is not necessary to submit the plan to "any class of stockholders" if the Commission "shall have found, and the judge shall have affirmed the finding, . . . that at the time of the finding the equity of such class of stockholders has no value."

Commission did exactly that. Its finding that the stock had no value was definite and explicit. To require it to go further and formalize in findings the numerous data on which it relied in the exercise of its expert, informed judgment would be to alter the statutory scheme. Apart from the necessity of making a finding for the exclusion of stock or any class of creditors as provided in § 77 (e), the mandate which Congress gave the Commission by § 77 (d) is merely to approve a plan "that will in its opinion meet with the requirements of subsections (b) and (e) of this section, and will be compatible with the public interest." Reasons which underlie the expert opinion which the Commission expresses on a plan of reorganization under § 77 need not be marshalled and labelled as findings in order to make intelligible the Commission's conclusion or ultimate finding or to make possible the performance on the part of the courts of the functions delegated to them. Here, as in other situations (*Colorado* v. *United States,* 271 U. S. 153, 166–169; *United States* v. *Louisiana,* 290 U. S. 70, 76–77; *Florida* v. *United States,* 292 U. S. 1, 8–9), it is the conclusion or ultimate finding of the Commission together with its reasons and supporting data which are essential. Congress has required no more. Nor was it necessary for the Commission to make a precise finding as to the value of the road in order to eliminate the old stock from the plan. A finding as to the precise extent of the deficiency is not material or germane to the finding of "no value" prescribed by § 77 (e).

But it is urged that the Commission employed the incorrect criteria for determining the permissible capitalization of the new company. In this connection, reliance is placed on § 77 (e), which provides in part that the "value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospec-

tive, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts." It is argued that, under this provision, earning power is not the primary criterion of value and that the Commission did not give proper weight to original cost, reproduction cost new, or the valuation for rate making purposes. We disagree. We recently stated in *Consolidated Rock Products Co.* v. *Du Bois, supra,* in connection with a reorganization of an industrial company, that the "criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable." p. 526. That is equally applicable to a railroad reorganization. Mr. Justice Brandeis once stated that "value is a word of many meanings." See *Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 310, concurring opinion. It gathers its meaning in a particular situation from the purpose for which a valuation is being made. Thus the question in a valuation for rate making is how much a utility will be allowed to earn. The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn. Earning power was the primary test in former railroad reorganizations under equity receivership proceedings. *Temmer* v. *Denver Tramway Co.,* 18 F. 2d 226, 229; *New York Trust Co.* v. *Continental & Commercial Bank,* 26 F. 2d 872, 874. The reasons why it is the appropriate test are apparent. A basic requirement of any reorganization is the determination of a capitalization which makes it possible not only to respect the priorities of the various classes of claimants but also to give the new company a reasonable prospect for survival. See

Commissioner Eastman dissenting, Chicago, M. & St. P. Reorganization, 131 I. C. C. 673, 705. Only "meticulous regard for earning capacity" (*Consolidated Rock Products Co.* v. *Du Bois, supra,* p. 525) can afford the old security holders protection against a dilution of their priorities and can give the new company some safeguards against the scourge of overcapitalization. Disregard of that method of valuation can only bring, as stated by Judge Evans for the court below, "a harvest of barren regrets." 124 F. 2d p. 765. Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes. And it is our view that Congress when it passed § 77 made earning power the primary criterion. The limited extent to which § 77 (e) provides that reproduction cost, original cost, and actual investment may be considered indicates that (apart from doubts concerning constitutional power to disregard them) such other valuations were not deemed relevant under § 77 any more than under § 77B "except as they may indirectly bear on earning capacity." *Consolidated Rock Products Co.* v. *Du Bois, supra,* p. 526. In this case the Commission followed the statute. While it made earning power the primary criterion, it did not disregard the other valuations. It considered them and concluded in substance that they afforded no reasonable basis for believing that the probable earning power of the road was greater than what the Commission had found it to be by the use of other standards. The Commission need not do more.

The finding of the Commission, affirmed by the District Court under § 77 (e), that the stock had "no value" is supported by evidence. The issue involved in such a determination is whether there is a reasonable probability that the earning power of the road will be sufficient to pay prior claims of interest and principal and leave some surplus for the service of the stock. If it is established that there is no reasonable probability of such earning power,

then the inclusion of the stock would violate the full priority rule of *Northern Pacific Ry. Co.* v. *Boyd,* 228 U. S. 482—a rule of priority incorporated in § 77 (e) (1), as in § 77B and Ch. X (*Case* v. *Los Angeles Lumber Products Co., supra; Marine Harbor Properties* v. *Manufacturers Trust Co.,* 317 U. S. 78) through the phrase "fair and equitable." A valuation for reorganization purposes based on earning power requires of course an appraisal of many factors which cannot be reduced to a fixed formula. It entails a prediction of future events. Hence "an estimate, as distinguished from mathematical certitude, is all that can be made." *Consolidated Rock Products Co.* v. *Du Bois, supra,* p. 526. But recognizing the possible margin of error in any such prediction, we cannot say that the expert judgment of the Commission was erroneous when made or that the District Court was not justified in affirming the finding of "no value."

The question of the increase in earnings since the Commission approved the plan raises of course different issues. As we have indicated in the *Western Pacific* case, the power of the District Court to receive additional evidence may aid it in determining whether changed circumstances require that the plan be referred back to the Commission for reconsideration. The hearings before the Commission were closed in 1938 and its report rendered in 1940. The hearings before the District Court were held in September 1940. It had before it the trustees' annual reports for 1937, 1938 and 1939 and a statement of operating revenues and income available for fixed charges through the first half of 1940. Similar figures were before the Circuit Court of Appeals for most of 1941. The debtor and the preferred stockholders contend on the basis of those figures that the Commission's conclusion that there is no evidence that a "recovery of the earning power of 1928–29 is reasonably probable" has been disproved by subsequent events. They argue that while the net earnings for 1928,

1929 and 1930 were $30,671,000, $29,105,000 and $17,-938,000 respectively, those for 1940 were $14,867,000 and for 1941 $28,939,000. And they point out that the net for 1940 was almost as great as, and the net for 1941 was much in excess of, the estimated $15,894,000 of net earnings for the future normal year to which the Commission referred. They also point to the fact that while that estimate indicated that 12½% of gross would be left for fixed charges, that percentage for 1940 was 13% and for 1941 20.6%.

We agree with the Circuit Court of Appeals that no sufficient showing of changed circumstances has been made which requires the District Court to return the plan to the Commission for reconsideration. Late in 1939 the Commission had occasion to say, "We know from past experience that the upswing in business which war brings is temporary and likely to be followed by an aftermath in which conditions may be worse than before." 53d Annual Report, p. 5. The record during the last World War is illuminating. It shows that the Milwaukee's net operating income rose to almost $31,000,000 in 1916, exceeded $21,500,000 in 1917, dropped to about $4,000,000 in 1918 and to about $2,000,000 in 1919 and showed a deficit of over $14,000,000 in 1920. See Chicago, M. & St. P. Reorganization, 131 I. C. C. 673, 715. As we have noted, the Commission conceived as its responsibility the devising of a plan which would serve "as a basis for the company's financial structure for the indefinite future." We cannot assume that the figures of war earnings could serve as a reliable criterion for that "indefinite future." As some of the bondholders point out, the bulge of war earnings *per se* is unreliable for use as a norm unless history is to be ignored; and numerous other considerations, present here as in former periods, make them suspect as a standard for any reasonably likely future normal year. Among these are the great increase in taxes and in certain costs of

operation and the decrease in water and truck competition. In addition to the increase in tax rates, of which we cannot be unmindful, there is the likely increase of the total tax burden occasioned by the conversion of debt into stock. It is estimated by certain bondholders that by reason of this fact a full dividend could not be paid on the new preferred stock and no dividend could be paid on the new common stock even on the basis of earnings as great as those for 1941. In view of these considerations, we cannot say that the junior interests have carried the burden which they properly have of showing that subsequent events make necessary a rejection of the Commission's plan.

But it is suggested that the vice of the Commission's plan is the formulation of a capital structure which as a result of conversion of debt into stock so increases the impact of mounting taxes on the company as to deprive junior interests of net earnings which would be available for distribution to them if the ratio of debt to stock were increased. Such a conversion of debt into stock is said to be entirely unnecessary to the formulation of a sound plan and results in unfairness to junior interests. The difficulty with that argument is that Congress has entrusted the Commission, not the courts, with the responsibility of formulating a plan of reorganization which "will be compatible with the public interest." § 77 (d). The nature of the capital structure, as well as the amount of the capitalization, is a component of "the public interest." For the "preservation of the transportation system and the stability of its credit essential to its preservation depend not alone upon the ability of individual carriers to meet their obligations, but upon the ability of all to attract the investment of funds in their securities." See *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 337 (dissenting opinion). Furthermore, Congress

has provided in § 77 (b) (4) that the fixed charges (including fixed interest on funded debt) provided in the plan shall be "in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof." The ratio of debt to stock, the amount of fixed as distinguished from contingent interest, the kind of capital structure which a particular company needs to survive the vicissitudes of the business cycle—all these have been reserved by Congress for the expert judgment and opinion of the Commission, which the courts must respect. Nor can we conclude that there is anything in § 77 which indicates that it may be used merely as a moratorium. Elimination of delay in railroad receivership and foreclosure proceedings was one of the purposes of the enactment of § 77. *Continental Bank* v. *Chicago, R. I. & P. Ry. Co.,* 294 U. S. 648, 685. Sec. 77 (g), giving the District Court power to dismiss the proceedings for "undue delay in a reasonably expeditious reorganization," was inserted in recognition of "the necessity of prompt action." (H. Rep. No. 1283, 74th Cong., 1st Sess., p. 3.) We cannot conclude that in this proceeding, which already has been pending seven years and which was before the Commission for over four years, the interests of junior claimants have been sacrificed for speed. The House Judiciary Committee only recently stated [9] that "where a railroad company is so burdened with a heavy capital structure that it is in need of thoroughgoing reorganization, it is not in the public interest, nor even, except temporarily, in the interest of the company itself, that such a reorganization

---

[9] Respecting the new Ch. XV of the Bankruptcy Act, c. 610, 56 Stat. 787, which provides for certain voluntary adjustments of obligations of railroads.

be postponed." H. Rep. No. 2177, 77th Cong., 2d Sess., p. 6. No case has been made out for further delay here.

Finally, it is argued on behalf of some of the stockholders that the effective date of a plan promulgated under § 77 must be the date of the filing of the petition, the theory being that § 77 does not permit the accrual of interest after that date. In *Consolidated Rock Products Co.* v. *Du Bois,* we held that, under § 77B, interest on secured claims accrued to the effective date of the plan was entitled to the same priority as the principal. See 312 U. S. p. 514, note 4, p. 527, and cases cited. The definition of the terms "creditors" and "claims" was substantially the same under § 77B (b) as it is under § 77. We see no reason why the same result should not obtain here.

*Treatment of the Terre Haute Bonds.* The treatment accorded these bonds is attacked by the Terre Haute and representatives of its bondholders as well as by certain groups of Milwaukee bondholders. The Terre Haute interests contend, in the first place, that the plan contains no findings necessary for determining how the sacrifices required of these bondholders shall be distributed *inter se.* It is pointed out that the modifications proposed by the Commission for these four classes of bondholders are to be made regardless of the lien, security, interest or maturity of each and the earning power of the respective underlying properties. Hence it is argued that this phase of the plan is not fair and equitable, since it does not even attempt to preserve the respective priorities of these bond issues. The short answer to that objection is that the Terre Haute properties have not been treated by the Commission or the District Court as a part of the properties of the debtor for reorganization purposes. Nor has any question been raised or argued here as to the power of the Commission or the District Court so to treat them. The Commission and the District Court considered the

problem solely as one of rejection or affirmance of a lease. The Terre Haute bondholders were in effect given the option to take the Terre Haute lines back or to agree to a reduced rental. If the Commission had authority to determine the question of rejection in the manner indicated and if it complied with the legal requirements for the exercise of that authority, the modifications which it proposed and which the District Court approved are valid. We think they are.

In 1928 the Commission reviewed the history of the acquisition of this property. 131 I. C. C. 653–660. It then said that the Terre Haute was "a distress property controlled by a committee of Chicago bankers who wanted to liquidate and who had written the securities off the books of their banks as losses" (pp. 657–658); that "the terms upon which the property was acquired were improvident and to that extent adversely affected the financial condition of the St. Paul" (p. 657); and that "the total financial burden as of June 30, 1925, which had fallen upon the income of the St. Paul as a result of this lease was nearly $11,000,000." p. 656. In its present report the Commission, after reviewing certain earnings data, concluded that "the earning power of the Terre Haute is sufficient to cover all interest requirements, but this earning power is largely dependent on a continuation of the Milwaukee's coal traffic, together with the commercial coal traffic that accompanies it, and would be greatly diminished if such traffic ceased." And it added, "The present arrangement is distinctly to the advantage of the Terre Haute." The Commission concluded, however, that a rejection of the lease would be to the "disadvantage" of both companies and that some means should be provided "for retaining the Terre Haute lines as a part of the system without unduly jeopardizing a successful reorganization of the Milwaukee." The Commission, on the other hand, felt that an affirmance would be inequitable from

548

the point of view of the Milwaukee bondholders. The present interest charges on the Terre Haute are about $1,023,000 a year. If those were assumed by the new company and fixed interest charges were kept at about $4,270,000 a year as provided in the plan, the amount of new first mortgage bonds which could be issued would have to be reduced by $10,500,000. Such a reduction, said the Commission, would mean a "substantial sacrifice" by Milwaukee bondholders which would be "entirely inequitable." In that connection, it also noted that if the $21,929,000 of Terre Haute bonds were assumed by the new company, they would constitute about 27% of the total amount of new fixed interest debt. This would mean that the allotment of fixed interest bonds to the General Mortgage bondholders "could not be more than double the amount of the existing Terre Haute bonds, whereas the mileage represented by the general mortgage is about 18 times that of the Terre Haute, and on the basis of the elements of value . . . for the lines covered by the general mortgage, about 17 times that of the Terre Haute properties." Those considerations of fairness constituted the primary reason which led the Commission to reject such an "inequitable" proposal. But there were other reasons too. The early maturities on the Terre Haute bonds, the substantial default of the debtor under its covenant in the lease to replace equipment, restrictions on the abandonment of property (all of which were covered by the proposed modifications) also played a part in the Commission's conclusion that the lease should not be assumed by the new company. The Commission said that its proposed modifications were "the best that we could devise in the public interest and as affording fair and equitable treatment to both the bondholders of the Terre Haute and those of the debtor." The District Court concurred with the Commission for substantially the same reasons. The Circuit Court of Appeals said it could not

approve that action without more specific findings. Just what findings it thought necessary we do not know. The Terre Haute interests suggest that the deficiency was in the lack of any finding that the lease was burdensome. And they add that only leases found to be burdensome may be rejected and that the evidence would not support any such finding if made.

The argument of the Terre Haute interests that *only* burdensome leases may be rejected is based on certain statements of ours that burdensome leases may be rejected (*Palmer* v. *Webster & Atlas National Bank,* 312 U. S. 156, 163; *Philadelphia Co.* v. *Dipple,* 312 U. S. 168, 174) and on cases like *American Brake Shoe & Foundry Co.* v. *New York Rys. Co.,* 278 F. 842, 844, which hold that an equity receiver may not reject a lease when it does not appear that "in carrying out its affirmative obligations the estate suffers an actual loss as distinguished from the obtaining of a more profitable rental." And an extended analysis of the operations under the lease is made to show that the lease is a valuable asset of the estate and that the debtor received a net financial benefit from it in recent years. We do not need to determine, however, what is the scope of the authority to reject leases under § 77, either by the trustees or pursuant to a plan of reorganization. For here we think that the proposed modifications of the lease contained in the plan were wholly justified. The Terre Haute bondholders are "creditors" of the debtor as defined in § 77 (b), for they are holders of "a claim under . . . an unexpired lease." Sec. 77 (b) (5) provides not only that the plan "may" contain provisions rejecting unexpired leases but also that it "may include any other appropriate provisions not inconsistent with this section." It is also stated in subsection (b) (1) that a plan "shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through

the issuance of new securities of any character or otherwise." In addition, § 77 (b) (4) provides that the plan "shall provide for fixed charges" including "rent for leased railroads" in such an amount "that . . . there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof." And § 77 (e) requires the District Court to be satisfied, before approving the plan, that it is "fair and equitable" and "does not discriminate unfairly in favor of any class of creditors." These provisions taken together mean to us that the Commission (and the District Court) have the authority in approving a plan to condition acceptance of a lease on terms which are necessary or appropriate to keep the fixed charges within proper limits or to do equity between claims which arise under the lease and the other claims against the debtor. Like the question whether a lease is burdensome (see Meck & Masten, *Railroad Leases and Reorganization,* 49 Yale L. Journ. 626, 649), one phase of that problem is whether the lease is worth its annual charge. A disregard in that determination of the sacrifices which other creditors are making would be wholly incompatible with the standards which § 77 has prescribed for reorganization plans. At the same time, if the Commission deems it desirable to keep the leased line in the system, it must necessarily have rather broad discretion in providing modifications of the lease where, as here, the lessor is not being reorganized along with the debtor. For under that assumption the modification must be sufficiently attractive to insure acceptance by the lessor or its creditors. Thus, the question whether a lease should be rejected and, if not, on what terms it should be assumed is one of business judgment. See *Mercantile Trust Co.* v. *Farmers' Loan & Trust Co.,* 81 F. 254, 259; *Park* v. *New York, L. E. & W. R. Co.,* 57 F. 799, 802. Certainly there was ample evidence warranting the conclusion of the Commission and the District Court that affirmance of the

lease would be unjust from the viewpoint of other creditors. And we could not say that the Commission, exercising its expert judgment, and the District Court, affirming that judgment, were too generous in the offer which is made to the Terre Haute bondholders or that they should have rejected the lease. We are not warranted in upsetting those determinations on review except on a clear showing that the limits of discretion have been exceeded. We cannot say that here.

Finally, the Terre Haute interests object to the provisions of the plan which state that the Terre Haute lease shall be rejected as of the date the District Court determines that the Terre Haute bondholders have not consented to the making of a new lease at a reduced rental. They contend that the lessor's claim for damages for breach of the lease must be measured as of the date on which the proceeding was instituted. They further contend that, in the event of rejection of a lease, operation of the leased property subsequent to the commencement of the proceeding must be for the account of the lessor—the latter being liable for all losses and being entitled to any net earnings. On the first point they rely on § 77 (b), which provides that, in case an unexpired lease is rejected, "any person injured by such nonadoption or rejection shall for all purposes of this section be deemed to be a creditor of the debtor to the extent of the actual damage or injury determined in accordance with principles obtaining in equity proceedings." It is argued that, since this Court held that that provision places leases "upon the same basis as executory contracts" (*Connecticut Ry. Co.* v. *Palmer,* 305 U. S. 493, 502), the rule governing breaches of an executory contract (*Pennsylvania Steel Co.* v. *New York City Ry. Co.,* 198 F. 721, 744; *Samuels* v. *E. F. Drew & Co.,* 292 F. 734, 739) must be applied here. This Court stated in the *Palmer* case, however, that the provision in § 77 (b) which allows the lessor to prove his "actual dam-

age or injury determined in accordance with principles obtaining in equity proceedings" does not "refer to any rule for the measure of damages in equity receiverships." 305 U. S. p. 503. Furthermore, as we have noted, § 77 (b) provides not only that a plan may reject unexpired leases but also that it "may include any other appropriate provisions not inconsistent with this section." And § 77 (b) (1) says that a plan "shall include provisions modifying or altering the rights of creditors generally." For the reasons which we have already stated, these provisions give the Commission and the District Court power to adjust the claims under the lease so as to do equity between the various classes of creditors. Deferment of the date as of which the lease shall be rejected is an appropriate exercise of that power. During the § 77 proceedings the stipulated annual rental under the lease has been paid. In view of all the facts, no element of injustice to the lessor is apparent by reason of the deferment of the date as of which its damages, if any, will be measured.

For similar reasons we conclude that, in event of rejection of the lease, operation subsequent to the commencement of the proceeding and prior to the rejection need not be for the account of the lessor so as to entitle it to any net earnings. As we have noted, the stipulated annual rental has been paid during the § 77 proceedings. The court order authorizing the payment of interest (which is part of the rental) stated that it should not be construed "to preclude or conclude the Debtor in respect of its right of election to disaffirm or discontinue" the lease. And § 77 (b) provides that the adoption of an unexpired lease by the trustees "shall not preclude a rejection" of it in a plan of reorganization. Furthermore, § 77 (c) (6) provides:

"If a lease of a line of railroad is rejected, and if the lessee, with the approval of the judge, shall elect no longer to operate the leased line, it shall be the duty of the lessor

at the end of a period to be fixed by the judge to begin the operation of such line, unless the judge, upon the petition of the lessor, shall decree after hearing that it would be impracticable and contrary to the public interest for the lessor to operate the said line, in which event it shall be the duty of the lessee to continue operation on or for the account of the lessor until the abandonment of such line is authorized by the Commission in accordance with the provisions of section 1 of the Interstate Commerce Act as amended."

Sec. 77 (c) (6) contains no express provision that on rejection of a lease the operation of the property by the lessee shall be for the account of the lessor for the period prior to the rejection. But the Terre Haute interests seek to read into § 77 the doctrine of relation back so that in case of a rejection of the lease the lessee's operation during the entire period of bankruptcy is for the account of the lessor, the latter being responsible for all losses and entitled to all the net earnings. That was the general rule governing railroad leases in equity receivership proceedings (See Meck, *Railroad Leases and Reorganization,* 49 Yale L. Journ. 1401, 1405–1407), at least where the receivers of the lessee made no payments of rent during the term of their possession. *Pennsylvania Steel Co.* v. *New York City Ry. Co., supra,* 730–732; *American Brake Shoe & Foundry Co.* v. *New York Rys. Co.,* 282 F. 523. And see *United States Trust Co.* v. *Wabash Western Ry. Co.,* 150 U. S. 287. And there is some authority for the view that the same result follows even though unconditional payments of rent have been made in the interim, the theory being that the receiver must "be held to have occupied from the beginning the same position that he ultimately assumes." *Westinghouse Electric & Mfg. Co.* v. *Brooklyn Rapid Transit Co.,* 6 F. 2d 547, 549. But see *Second Avenue R. Co.* v. *Robinson,* 225 F. 734. Cf. *Sunflower Oil Co.* v. *Wilson,* 142 U. S. 313. But the rule was

not a hard and fast one. It permitted exceptions based on equitable considerations. *Westinghouse Electric & Mfg. Co.* v. *Brooklyn Rapid Transit Co., supra,* p. 551. So, although we assume *arguendo* that Congress incorporated the prior equity rule into § 77 (c) (6), which recognizes the necessity of keeping a railroad in operation until the public authority permits discontinuance (*Warren* v. *Palmer,* 310 U. S. 132), it does not necessarily follow that the lessor would be entitled to the net earnings accruing prior to the rejection, at least where the trustees have unconditionally paid the stipulated annual rental for that period. Cf. *Palmer* v. *Palmer,* 104 F. 2d 161. To be sure, we recognized in *Palmer* v. *Webster & Atlas National Bank, supra,* that the trustees of a lessee on their rejection of the lease operated the leased lines for the account of the lessor, the latter being liable for losses for the whole period. But we are here dealing with a rejection of a lease pursuant to a plan of reorganization. And the question raised relates to the fairness of that plan as between classes of creditors—one group being the Terre Haute bondholders, and the other the Milwaukee bondholders. In the event of a rejection of the lease, the Terre Haute interests are claiming that they are entitled not only to a return of the leased lines, to a claim against the estate for damages, and to the stipulated annual rental up to the date of the rejection, but also to any and all net income from the leased property in excess of that rent. Such a claim for net income, like a claim for rent, would be a charge against the estate for whose payment a plan of reorganization must provide. § 77 (e) (3). The amount of those charges, like other demands on the cash resources of the estate or the new company, have a decided bearing on the fairness and integrity of a plan of reorganization. The Commission and the District Court certainly have authority to determine whether the total amount which the lessor receives on rejection of the lease

is fair in comparison with the sacrifices which the other creditors make. The District Court agreed with the Commission that it would be inequitable to give the Terre Haute interests, in the event of a rejection, more than a return of the leased lines, an unsecured creditor's claim for damages, and the stipulated annual rental. We cannot say that that was not a fair equivalent of their claim. Nor can we say that their sacrifices, as compared with the sacrifices being made by the other Milwaukee creditors, are so great that they should receive an additional cash payment from the estate. Sec. 77 (c) (6) and the doctrine of relation back are not to be considered separate and apart from the other provisions of the Act. The end product of this reorganization system is supposed to be a fair plan. When a lease is rejected pursuant to a plan, § 77 (c) (6) may not be applied so as to give the lessor or its creditors a disproportionate claim against the estate.

*General Mortgage Bonds.* The objections of the corporate trustee and of a group of these bondholders are that the allocation of new securities under the plan violates their priority rights, that the findings of the Commission are inadequate to sustain that allocation of new securities, and that the additions and betterments fund impairs their priorities.

The Circuit Court of Appeals was of the view that the plan could not be approved because of the absence of certain findings which it thought were necessitated by *Consolidated Rock Products Co.* v. *Du Bois, supra.* It concluded that the findings must include specific values of liens to be surrendered and specific values of securities given in exchange. In its view, this defect in the Commission's reports permeated the whole plan except the finding of "no value" for the stock. As we have pointed out in the *Western Pacific* case, such a view misinterprets *Consolidated Rock Products Co.* v. *Du Bois.* In that case the District Court had found that the properties were

worth more than the amount of the debt, in spite of the fact that they had been operated at a loss for a period of more than eight years. And it admitted stockholders to participation in the plan in the face of that fact and also without compensating the bondholders for their accrued interest. Furthermore, the District Court in that case approved a distribution of new securities to bondholders under two different mortgages without attempting to ascertain what properties were covered by each. In addition, the plan as approved cancelled a claim against the holding corporation without making any finding as to its amount or validity. We held (1) that the "criterion of earning capacity is the essential one" in making a valuation for reorganization purposes (312 U. S. p. 526); (2) that some valuation of the assets of the holding company and of the claim against it must be made, so that there could be a determination as to whether it, as stockholder, was making a contribution to the new company for which it would receive new stock; (3) that at least an "approximate ascertainment" of the assets subject to the two mortgages must be made (312 U. S. p. 525), as a question of the fairness of the plan between the two classes of bondholders had been raised; and (4) that in applying the full priority rule of the *Boyd* case (228 U. S. 482) and the *Los Angeles Lumber Products* case (308 U. S. 106) full "compensatory provision must be made for the entire bundle of rights which the creditors surrender." 312 U. S. p. 528. And we added (p. 529), "Practical adjustments, rather than a rigid formula, are necessary. The method of effecting full compensation for senior claimants will vary from case to case." Applying these principles here, we are of the view that, except as hereinafter noted, the findings and conclusions of the Commission and the District Court were adequate and proper.

The objections of the General Mortgage bonds are that full compensation was not afforded them for the loss of

their first lien position, and that to sustain the allocation of new securities to them it must be determined that the new securities had in fact a value representing compensation for the priority of the old. We can put to one side at this point the treatment of the Terre Haute bonds at which the General Mortgage bonds direct some of their criticism. For the reasons which we have already stated, we cannot substitute our opinion for the business judgment of the Commission and say that the Terre Haute lease should have been rejected outright or that the Terre Haute interests would consent to a new lease on less favorable terms than are offered. Nor do we stop to analyze the facts warranting the preferred treatment accorded the amply secured claim of the Reconstruction Finance Corporation. For no argument is pressed here that the allocation of new First Mortgage bonds for the full amount of that claim was not warranted. Furthermore, we cannot agree with the suggestion that the General Mortgage bonds should have been granted a larger participation in new fixed interest securities. As we have noted, 25% of their claims is to be satisfied with the new First Mortgage bonds. We have already reviewed the reasons why the Commission felt that the fixed interest charges should not exceed about $4,270,000 a year. It should be noted at this point that the Commission stated that it saw "no means by which the exact present lien position of the general mortgage bonds or the 50-year bonds can be preserved except under a prohibitive mortgage structure." As we have stated, the determination of the kind of capital structure which a railroad emerging from reorganization should have is peculiarly a question for the expert judgment of the Commission. To give the General Mortgage bonds a larger percentage of new First Mortgage bonds would necessitate an increase in the total fixed interest charges of the new company. We would intrude on the Commission's function if we undertook to

direct that any such increase be made. The same reply may be given the contention that the Commission should not have created new system mortgages but should have left the 50-year bonds secured by a separate mortgage or should have created a separate corporation to operate the western lines which comprise the main security for the 50-year bonds. The Commission considered and rejected these proposals, saying that it was "of great importance that a completely unified system be created through the reorganization and that the capital structure be not complicated by numerous mortgages." Such a determination is peculiarly one for the Commission under § 77. So far as the law is concerned, there is no obstacle to the substitution of system mortgages for divisional ones. We so held in *Consolidated Rock Products Co.* v. *Du Bois, supra,* pp. 530–531, indicating that the requirements of feasibility and practicability may often necessitate such a course. The same principles are applicable here.

So the problem for us on this phase of the case is whether, within the framework of the capital structure which has been designed, the allocation of new securities to the General Mortgage bonds was permissible within the rule of the *Boyd* and the *Consolidated Rock Products* cases. On this record, that entails primarily a consideration of the treatment accorded the General Mortgage bonds, on the one hand, and the Milwaukee & Northern bonds and the 50-year bonds on the other.

As we have noted, the General Mortgage bonds are to receive 25% of their claims in new First Mortgage bonds, 35% in Series A and 20% in Series B, new General Mortgage bonds, and 20% in preferred stock. The same treatment is accorded the Milwaukee & Northern Consolidated Mortgage bonds. The Milwaukee & Northern First Mortgage bonds, however, are to receive 70% of their claims in new First Mortgage bonds and 30% in Series A new General Mortgage bonds. And the 50-year bonds

are to receive 15% of their claims in Series B, new General Mortgage bonds, 60% in new preferred stock, and 25% in common stock. If the criterion of earning power be given the weight which we think is necessary under this statutory system, the Milwaukee & Northern First Mortgage bonds are entitled to preferred treatment over the General Mortgage bonds and the Milwaukee & Northern Consolidated bonds. On the basis of system earnings for 1936, the Commission noted that income available for the Milwaukee & Northern First Mortgage bonds was about three times interest charges, and for the General Mortgage bonds about 1.16. In the case of the Milwaukee & Northern Consolidated Mortgage bonds, the interest for the same period was earned about 1.2 times. Regard for the earning power of those respective units of property led to the preferred treatment of the Milwaukee & Northern First Mortgage bonds and to the same offer being made to the General Mortgage bonds as was made to the Milwaukee & Northern Consolidated Mortgage bonds. But the attack of the General Mortgage bonds is directed, in the main, to the participation accorded the 50-year bonds and to the inadequacy as compared with them of the treatment given the General Mortgage bonds.

They point out that the Commission referred to the General Mortgage lines as "the heart of the system"; that the interest on these bonds has been earned, with the exception of a few years, since 1889; that the western lines securing the 50-year bonds are deficit lines. In that connection they refer to the Commission's statement that the losses by the western lines were $142,591 in 1930 and $1,540,808 in 1931, before payment of interest and that "on any reasonable basis of allocation between the lines west and the other parts of the system, the lines west cannot be expected to earn any sum for the payment of interest. In years when the system earnings approach $10,000,000,

some interest is apparently earned for the 50-year mortgage bonds under the present capital structure, but this reflects system operation and does not demonstrate any earning power for the western lines." But the problem for the Commission and the District Court was not as simple as the General Mortgage bondholders make it appear. The lien of the 50-year bonds embraces not only the western lines but also, subject to the First and Refunding Mortgage, the leasehold interest of the debtor in the Terre Haute and stocks and bonds of other companies, the most important of which are shares of Indiana Harbor Belt R. Co. and most of the Terre Haute stock. There was evidence that income from certain securities pledged under the First & Refunding Mortgage (largely the Indiana Harbor Belt stock) was $402,031 in 1936 and net income from the Terre Haute during that year was $875,327, after payment of all interest charges. Though the Commission recognized that the propriety of crediting the 50-year mortgage with income from the Terre Haute was doubtful because of the assumption that the First & Refunding Mortgage would be satisfied by other earnings, it gave some weight to those earnings in determining the participation to be accorded the 50-year bonds. Thus, it noted that one analysis in 1935 showed about $1,000,000 available for interest on the 50-year bonds, "on the basis of $10,263,185 of system earnings available for fixed charges, approximately $2,000,000 of net income from the Terre Haute, and a deficit of $500,000 on the lines west." The Commission also reviewed another analysis showing that the First & Refunding Mortgage lines contributed $6,249,099 of gross revenues and $3,300,400 of net revenues to the General Mortgage lines in 1936; and that the income for the 50-year mortgage lines (after payment of interest on the bonds of the Terre Haute, the Northern, the Gary, and the First & Refunding) was about $2,000,000, while the income of the General Mortgage lines avail-

able for interest was approximately $6,400,000, after interest on equipment certificates. While the Commission was critical of that analysis, it felt that that computation deserved "careful consideration," as the estimate of $2,000,000 was "roughly comparable" to the "other estimate of $1,000,000 in 1935, representing the earnings for the 50-year bonds, after payment of all interest on the general mortgage bonds." It noted that the analysis showing $2,000,000 available for the 50-year bonds also indicated that, on the basis of system earnings of about $12,300,000, all interest charges on the General Mortgage bonds, and only 38% of the interest on the 50-year bonds, were earned. The examiner had recommended that the 50-year bonds receive 10% of their claims in Series A, new General Mortgage bonds and 10% in Series B. The Commission did not consider that treatment "to be justified on any basis of earnings shown." It concluded that if the 50-year bonds were assigned a part of the new Series B bonds only, they would begin "to share earnings with the general mortgage bonds and Northern Consolidated bonds after $9,675,000 of prior charges." That treatment, said the Commission, "goes far toward resolving the doubts as to the accuracy or fairness of the allocation of earnings in favor of the 50-year bonds, without injustice to the general mortgage bonds."

The problem in such a case is not a simple one. The contribution which each division makes to a system is not a mere matter of arithmetical computation. It involves an appraisal of many factors and the exercise of an informed judgment. Furthermore, an attempt to put precise dollar values on separate divisions of one operating unit would be quite illusory. As the Commission recently stated, "The properties comprise one operating unit; a complete separation of values would necessarily have to be based on extensive assumptions of unprovable

validity; and any attempt at such a separation would in the end serve no purpose except to present an apparent certainty in the formulation of the plan which does not exist in fact." St. Louis Southwestern Ry. Co. Reorganization, 252 I. C. C. 325, 361. In the present case, the Commission and the District Court were satisfied that they had adequate data based on earning power to make a fair allocation of new securities between the General Mortgage bonds and the 50-year bonds. We cannot say that it was inadequate. Sec. 77 contains no formula for the making of such an allocation nor for the determination of the earning power of the entire system or parts thereof. The earnings periods to be chosen, the methods to be employed in allocating system earnings to the various divisions, are matters for the informed judgment of the Commission and the Court. Nor was there a failure here, as in the *Consolidated Rock Products* case, to ascertain what properties were subject to the respective divisional mortgages. With one minor exception, to be discussed later, that was done. So the Commission and the Court had before them data which we cannot say was inadequate to determine the allocation of new securities between these two classes of bondholders. Nor can we say that the Commission and the Court applied an incorrect rule of law in concluding that the plan was "fair and equitable" as between the General Mortgage bonds and the 50-year bonds. We are not dealing here merely with a first mortgage and a second mortgage on a single piece of property. For each of the two groups of bondholders has a first lien on a part of the Milwaukee properties.[10] In case of first and second liens on the same prop-

---

[10] The lien of the 50-year bonds is of course subject to the First & Refunding Mortgage bonds, all held by the Reconstruction Finance Corporation as security for its loan. But in view of the adequacy of that security, the Circuit Court of Appeals recognized that, as a practical matter, the 50-year bonds were to be considered as having a first lien on the western lines.

erty, senior lienors, of course, would be entitled to receive, in case the junior lienors participated in the plan, not only "a face amount of inferior securities equal to the face amount of their claims" but, in addition, "compensation for the senior rights" which they surrendered. *Consolidated Rock Products Co.* v. *Du Bois, supra,* p. 529. But where, as here, each group of bondholders is contributing to a new system mortgage separate properties from old divisional· mortgages, it is necessary to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. If that is done, each has obtained new securities which are the equitable equivalent of its previous rights, and the full priority rule of the *Boyd* case, as applied to the rights of creditors *inter se,* is satisfied. That rule was applied here. And the determination by the Commission and the District Court that its requirements were satisfied is supported by evidence. Sixty per cent of the General Mortgage bonds receives priority, as respects assets and earnings, over the 50-year bonds, since the former receive 25% in new First Mortgage bonds and 35% in Series A, new General Mortgage bonds, while the 50-year bonds were allotted none of those new securities. Furthermore, the General Mortgage bonds received a larger share of Series B bonds (20% as against 15%), a smaller share of new preferred stock (20% as against 60%) and· no common stock as compared with 25% by the 50-year bonds. For similar reasons, we cannot say that the treatment of the General Mortgage bonds as against the Milwaukee & Northern First Mortgage bonds and Consolidated Mortgage bonds was not fair and equitable. No fixed rule supplies the method for bringing two divisional mortgages into a new capital structure so that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at vari-

ous levels. The question in each case is one for the informed discretion of the Commission and the District Court. We cannot say that that discretion has been abused here.

We would have quite a different problem if the District Court had failed to perform the functions which § 77 (e) places upon it. But it cannot be said that there was any such failure here. The District Court satisfied itself that the principles of priority as applied to these facts were respected. See 36 F. Supp. pp. 202–203, 211–212. Since such a determination rests in the realm of judgment rather than mathematics, there is an area for disagreement. But we are not performing the functions of the District Court under § 77 (e). Our role on review is a limited one. It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end.

That leads to a question much discussed in this case, as in the *Western Pacific* case, as to the nature and extent of the findings necessary under § 77 in order to approve a plan as "fair and equitable." As we have said, the finding of the Commission, affirmed by the District Court, that the stock had "no value" was warranted. Furthermore, the Commission's determination of the permissible capitalization of the new company was sufficient as a finding of the maximum reorganization values which might be distributed among the various classes of security holders. But it has been argued here, as in the *Western Pacific* case, that a dollar valuation must be made of each old security and of each new security in order to give "full compensatory treatment" to senior claimants and to appropriate to the payment of their claims the "full value" of the property, in accord with the principles of *Consolidated Rock Products Co.* v. *Du Bois, supra,* p. 529. The rule in equity receivership cases that the creditors

were entitled to have the "value" (*Northern Pacific Ry. Co.* v. *Boyd, supra,* p. 508) or the "full value" (*Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.,* 271 U. S. 445, 454) of the property first appropriated to the satisfaction of their claims never was thought to require such valuations. Nor does the *Consolidated Rock Products* case or § 77 require them. We indicated in the *Los Angeles Lumber Products* case (308 U. S. p. 130) that compromises, settlements, and concessions are a normal part of the reorganization process. And see *Marine Harbor Properties* v. *Manufacturers Trust Co., supra.* We stated in the *Consolidated Rock Products* case (312 U. S. p. 526) that a determination of earning power of an enterprise "requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude." And in discussing the method by which creditors should receive "full compensatory treatment" for their rights, we emphasized, as already noted, that "Practical adjustments, rather than a rigid formula, are necessary." *Id.* p. 529. Certainly those standards do not suggest any mathematical formula. We recently stated in another connection that, whatever may be "the pretenses of exactitude" in determining a dollar valuation for a railroad property, "to claim for it 'scientific' validity, is to employ the term in its loosest sense." *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362, 370. That is equally true here. A requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process. See Bourne, *Findings of "Value" in Railroad Reorganizations,* 51 Yale L. Journ. 1057. It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That

requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received "full compensatory treatment" rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts.

The General Mortgage bondholders attack the additions and betterments fund on the ground that it is unlawful and results in a dilution of their priority rights. They contend that § 77 (b) (4) [11] contemplates that the probable future earnings found to be available for fixed charges shall be used to pay those charges; that this provision of the plan reduces by $62,500,000 (the capitalized value of $2,500,000) the amount of new bonds available for the present underlying bonds; that additions and betterments are a capital charge and that the income of the road pledged to the underlying bonds cannot be diverted for that purpose at least without some compensating advantage given the underlying bonds; that the fund will enrich the junior interests at the expense of the bondholders; that the expenditures contemplated should be obtained from surplus earnings or from new capital raised under the open end First Mortgage.

The Commission, in determining that an additions and betterments fund should be set up, reviewed at some length the capital requirements of the system. It observed that, generally, "the expenditures for additions and

---

[11] Which provides that a plan of reorganization "shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that . . . there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof."

betterments have varied in proportion to earnings available for interest. Ordinarily with a rising trend in traffic and revenues the carrier would need more or better facilities." Its conclusion was that "the increased income should properly provide, in part, for their cost." These amounts would supplement the "cash represented by charges to depreciation, retirements, and salvage." And the plan provides that if the new company establishes an "operating expense account for its roadway and structures," the additions and betterments fund shall be paid from the amount credited to such fund for the applicable income period to the extent that such amount is adequate therefor. Likewise, the additions and betterments fund is to be credited with the amount which the new company "shall charge to operating expenses in any year" for the "cost of any additions and betterments, properly chargeable to capital account under the rules now in effect." Since the Commission recently has required railroad companies generally to establish a depreciation reserve with respect to their roadway and structures,[12] the General Mortgage bonds concede that the alleged illegality of such a fund will be rendered largely academic. But in any event, we see no barrier to a determination by the Commission that expenditures which are incident to a normal and proper operation of the road are costs or charges which should be paid before net income is computed. Nor can we see any legal reason why, as the Commission has determined here, those charges should not be in part dependent on the level of earnings. The Circuit Court of Appeals thought that there must be findings which would support both the allowance and its amount. But as we have pointed out earlier, Congress has merely provided in § 77 (d) that the plan approved by the Commission must be one which "will in its opinion meet the requirements

---

[12] Order of June 8, 1942, effective January 1, 1943.

of subsections (b) and (e) of this section, and will be compatible with the public interest." And in its report the Commission is directed to "state fully the reasons for its conclusions." We do not see where the Commission failed to meet these requirements. The need for such a fund and its amount involve matters of policy. The determination that a particular fund should be constituted calls for the exercise of an expert, informed judgment. The Commission clearly has power to require that such a fund be provided for in a plan of reorganization under § 77, whether or not the payments to it are properly included within the term "fixed charges" as used in § 77 (b) (4). For such a fund, like the amount of capitalization and the nature of the capital structure, may be highly relevant to the financial integrity of the company which emerges from reorganization and to stability and efficiency of the transportation system.

There are, however, two objections made by the General Mortgage bonds which we think have merit. The first of these relates to the dispute as to the so-called "pieces of lines east." The General Mortgage bonds contend here, as they did before the Commission, that they have a first lien on those properties by reason of the after-acquired property clause in their mortgage. The Commission credited the 50-year bonds with the earnings from those properties, indicating, however, that the propriety of doing so was doubtful in absence of a judicial determination of the question. Some of the General Mortgage bonds objected to that allocation before the District Court. The District Court, however, did not undertake to resolve the dispute. These General Mortgage bondholders likewise raised the point before the Circuit Court of Appeals. But it was not considered there. The objection has been renewed here but has not been argued on the merits. We can hardly treat the matter as *de minimis,* as there is evidence that these properties had a

net income of $170,100 in 1936. Nor can we conclude that the objection has been waived or that the claim is frivolous. Here, as in the *Consolidated Rock Products* case, the "determination of what assets are subject to the payment of the respective claims" (312 U. S. p. 520) has a direct bearing on the fairness of the plan as between two groups of bondholders. The District Court should resolve the dispute.

The second of these objections is that the General Mortgage bonds are to receive under the plan only a face amount of inferior securities equal to the face amount of their claims. The objection would, of course, not be valid if claimants wholly junior to the General Mortgage bonds were not participating in the plan. But here the Adjustment bonds, junior to the General Mortgage bonds, receive a large amount of common stock under the plan for their claim upon the mortgaged assets.[13] The rule of the *Boyd* case "protects the rights of senior creditors against dilution either by junior creditors or by equity interests." *Marine Harbor Properties* v. *Manufacturers Trust Co., supra.* That view has not been contested here. Hence, as we indicated in the *Consolidated Rock Products* case, where junior interests participate in a plan and where the senior creditors are allotted only a face amount of inferior securities equal to the face amount of their claims, they "must receive, in addition, compensation for the senior rights which they are to surrender." 312 U. S. 529. And we stated that whether they should "be made whole for the change in or loss of their seniority by an increased participation in assets, in earning or in control,

---

[13] This objection obviously would not run to a participation by junior creditors in unmortgaged assets—against which in this case 55,000 shares of common stock were reserved. Of those the Adjustment bonds were allotted 39,163 shares. But as we have noted, the Adjustment bonds were also allotted 1,749,492 shares of new common for their claim upon the mortgaged assets of the debtor.

or in any combination thereof, will be dependent on the facts and requirements of each case." *Id.* p. 529. We felt that that result was made necessary by the ruling in the *Boyd* case that, "If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control." 228 U. S. p. 508. We adhere to that view. Unless that principle is respected, there will be serious invasions of the rights of senior claimants to the benefit of junior interests. The property of one group will be subtly appropriated to pay the claims of another while lip service is rendered the principles of priority.

Some argument is advanced that under this plan the General Mortgage bondholders do receive as against the junior interests compensatory treatment which is adequate to make up for the seniority rights which they are to surrender. Part of that is said to be in the control which they obtain. It is pointed out that the plan provides for a five year voting trust in which the several groups of bondholders will be represented; that thereafter the plan protects their control by providing that the new preferred stock (all of which is to be issued to the Milwaukee & Northern Consolidated bonds, the Gary bonds, the General Mortgage bonds, and the 50-year bonds) will be entitled to cumulative voting to elect a majority of the board of directors during certain periods when full dividends on the preferred have not been paid; and that the exercise of the conversion rights of the Series B new General Mortgage bonds, allotted to these senior bondholders, would result in their acquisition of over 50% of both the preferred and common. It is also argued that compensatory treatment is to be found in the fact that the new General Mortgage bonds have sinking funds and are cumulative up to three years of interest, and that the new preferred stock is participating.

But neither the Commission nor the District Court considered the problem. As we have indicated, the question whether senior creditors have received "full compensatory treatment" rests in the informed judgment of the Commission and the court. A decision on that issue involves a consideration of the numerous investment features of the old and new securities and a financial analysis of many factors. Our task is ended if there is evidence to support that informed judgment. We are not equipped to exercise it in the first instance. Nor is it our function. Nor can we conclude that its omission in this instance was harmless. And minorities under § 77, like minorities under other reorganization sections of the Act (*Case* v. *Los Angeles Lumber Products Co., supra*, pp. 114–115, 128–129), cannot be deprived of the benefits of the statute by reason of a waiver, acquiescence or approval by the other members of the class. Certainly we cannot say that the inclusion in the new securities to be received by the General Mortgage bonds of features normally common to them are adequate compensation for the lost seniority. Our conclusion on the point is that, since junior interests are participating in the plan, the Commission and the District Court should determine what the General Mortgage bonds should receive in addition to a face amount of inferior securities equal to the face amount of their old ones, as equitable compensation, qualitative or quantitative, for the loss of their senior rights.

*50-Year Bonds.* The two points just discussed in relation to the General Mortgage bonds are equally applicable to the 50-year bonds. Final approval of the plan as it affects those two issues cannot be made until findings are made on those two matters.

The 50-year bonds raise other objections. We have already considered their major objections in other connections, and they need not be repeated. But a word should

be added in answer to their argument that the data before the Commission as to segregated earnings was too meager to warrant a permanent disruption of liens. They urge that the plan be remitted to the Commission so that the earning power of the various component parts or mortgage divisions of the road may be determined in light of earnings segregation studies, severance studies, and contributed traffic studies.[14] These are highly technical matters. See Meck & Masten, *Railroad Leases and Reorganization,* 49 Yale L. Journ. pp. 640–647. As stated above, we cannot say that the data as to earning power of the various divisions which was utilized by the Commission was inadequate. The earnings periods to be selected and the methods to be employed in allocating earnings among the various divisions are matters for the informed judgment of the Commission and the District Court. Whether earnings segregation, severance, or contributed traffic studies should be made is for the Commission initially to decide in light of the requirements of a particular case. We cannot say that those studies are so indispensable that they should be required here. Sec. 77 (c) (10) provides that the judge "may direct" the debtor or trustees "to keep such records and accounts, in addition to the accounts prescribed by the Commission," as will permit such a segregation and allocation of earnings and expenses. That does not indicate that Congress felt that the suggested studies were always necessary.

*Gary First Mortgage Bonds; Adjustment Bonds.* We have carefully considered the objections raised by these two groups. Their objections, for the most part, are of a

---

[14] Although the 50-year bonds and the debtor raised this point before the Commission as early as February, 1938, and the 50-year bonds raised it again when they filed their objections to the plan in the District Court, neither of them attempted to submit any such studies either in the hearings before the Commission or in the hearings before the District Court more than two years later.

kind which have been fully treated in other parts of this opinion and need not be elaborated. But one point raised by the Adjustment bonds need be mentioned. As we have noted, the interest on these bonds accrued to December 31, 1938 is over $79,000,000. The Commission ruled that, in view of the insufficiency of the mortgaged assets to meet the claims of the Adjustment bonds and the inadequacy of the free assets to satisfy the deficiency, with interest, and the unsecured claims, with interest, no allowance should be made in the plan for interest on these bonds subsequent to the date of the filing of the petition. For reasons we have already stated, the conclusion of the Commission that the mortgaged assets were insufficient to meet the bonded indebtedness was supported by evidence. Since the distribution provided for these bonds on the basis of their mortgage securities is less than the principal amount of their claim, the limitation of their right to share the unmortgaged assets ratably with the unsecured creditors on the basis of principal and interest prior to bankruptcy only is justified under the rule of *Ticonic National Bank* v. *Sprague,* 303 U. S. 406.

We have considered all other objections to the plan and find them without merit. But for the exceptions we have noted, we conclude that the District Court was justified in approving the plan and that the Circuit Court of Appeals was in error in reversing that judgment. Accordingly, we reverse in part and affirm in part the judgment of the Circuit Court of Appeals and direct that the cause be remanded to the District Court for proceedings in conformity with this opinion.

*It is so ordered.*

Mr. Justice Jackson and Mr. Justice Rutledge did not participate in the consideration or decision of these cases.

574

 

MR. JUSTICE ROBERTS:

This case presents two questions on which I feel compelled to express my views. I have set forth in *Ecker* v. *Western Pacific R. Corp., ante,* p. 448, what I consider the respective functions of the Interstate Commerce Commission and the district judge in respect of a plan of reorganization formulated under § 77. It follows from what I there said that I agree with the opinion of the Court except as herein noted.

The two matters as to which I disagree are the provisions of the plan respecting the lease of Chicago, Terre Haute & Southeastern Railway Company and the allocation of securities to the holders of General Mortgage bonds.

1. The statute deals with unexpired leases under which the debtor is lessee. It does not provide that the lessor may be brought into a reorganization proceeding with the debtor so that the properties of both debtor and lessor may be reorganized as a unit. On the contrary, all the relevant provisions contemplate the recognition of the lessor-lessee relation, and the dealing with the leased property in that light, and not as if it were part of the property of the lessee. The practice in equity receiverships prior to the adoption of § 77 permitted the affirmance or disaffirmance of unexpired leases. That practice is perpetuated in the reorganization statute. Prior to the formulation of a plan, the trustee appointed by the court may disaffirm the lease.[1] He may, on the other hand, adopt the lease.[2] But if he does so his adoption is subject to reversal by a provision in the plan providing for rejection.[3] The plan itself must, amongst other things,

---

[1] § 77 (c) (2); *Palmer* v. *Webster & Atlas National Bank,* 312 U. S. 156, 163.

[2] § 77 (b).

[3] *Id.*

provide for the rental payment under existing leases not rejected.[4] But the plan may provide for rejection and, in that case, the lessor is to be treated as a creditor with a claim for the amount of damage or injury done by rejection.[5] What is to be done with respect to the continued operation of a leased line upon the rejection of the lease is covered.[6]

It is evident that Congress concluded that the old and well-recognized principles applied in equity receivership should be substantially incorporated into § 77 so far as concerns unexpired leases. The draftsmen of the legislation did not provide for a case in which it would be to the interest of the reorganized corporation to retain the leased property under a new or amended lease stipulating for a reduced rental. But whether the omission to confer upon the Commission and the court the power to work out such a result arose from inadvertence or reasons of policy, or because of a belief that power was lacking, I need not speculate. Whatever the reason, it seems clear that such a case is not covered and that the only alternatives provided by the statute are disaffirmance or affirmance. In view of the provisions of subsection (b) as to what a plan shall or may include, I think it is inadmissible to find authority for what the Commission has done in this case in the concluding sentence of the first paragraph to the effect that the plan "may include any other appropriate provisions not inconsistent with this section." In view of the statutory provisions to which I have referred, the features of the plan respecting the Terre Haute lease are inconsistent with the section. Congress did not contemplate the treatment of a lessor as if the property it owns and leases to the debtor is part of the property to be re-

---

[4] *Id.*

[5] *Id.*

[6] § 77 (c) (6).

organized, nor did it intend to put the Commission in a position of bargaining with such a lessor for a new base.

The plan formulated by the Commission seems to me to be a straddle between these two alternatives. The holders of bonds secured by mortgages on the Terre Haute property are, in some aspects, treated as if they were mortgage creditors of the debtor. In other aspects, Terre Haute is treated as an arm's length creditor with whom a bargain must be struck. The vice of this seems apparent on this record. Whereas each class of mortgage creditors of the debtor is afforded a participation in the securities and probable earnings of the new company in purported compliance with the rule of the *Case* and *Rock Products* decisions, and whereas the Commission recognizes the difference in the nature of the lien and security of the three issues of mortgage bonds of Terre Haute, in the plan they are all treated alike and not accorded positions corresponding to their respective liens and priorities. The excuse for this is that the Commission is dealing with a lease and fixing a rental to be paid to an outside lessor. On the other hand, the concept of dealing with a lessor, as I read the record, moved the Commission to propose to the lessor what it thought would be an attractive offer in order to persuade the lessor to accept a new lease. In this aspect, the Commission, as I think, made the bondholders of Terre Haute, treated as a class, a proposition which gives them an inordinately superior position to that accorded the holders of General Mortgage bonds, and produces a serious discrimination against the latter.

I refer to these circumstances merely to reinforce what I have said above to the effect that it is evident Congress did not provide for any such treatment of the rights accruing under an unexpired lease. I am of opinion, therefore, that, as a matter of law, the plan adopted by the Commission does not conform to the standards set up by § 77, and particularly by subsection (b).

2. Upon the facts set forth in the Commission's report, I think it clear that the award of securities in the new corporation to the holders of General Mortgage bonds does not comply with the rule of absolute priority announced in the *Boyd* and *Rock Products* cases. If this is true, the plan violates subsection (e).

In conformity with what I have said in *Ecker* v. *Western Pacific R. Corp.*, I think the duty rested upon the district judge to sustain the objections of General Mortgage bondholders, because I cannot find in the facts stated by the Interstate Commerce Commission and those proved before the District Court any reasonable justification for the allocation made to them as against that made to the holders of bonds secured by the Milwaukee & Northern Consolidated Mortgage and the Fifty Year Mortgage, or for the treatment accorded them in comparison to that accorded Terre Haute's bondholders. The opinion of the Court treats this question as, in effect, lying within the sound discretion of the district judge and refuses to review his action on the ground that it is not evident he abused that discretion. I am of the view that, unless we are to recant what we have heretofore said, the rule of law as to the maintenance of the respective positions of lienors must be enforced. Of course, that rule must be applied in the light of the facts of each case, but I do not think the district judge may abdicate the duty of examining those facts and correcting what is shown to be a clear infraction of the rule. Neither the judge nor the Commission need essay to value the property under each mortgage, or the securities to be allocated to the mortgagees under it, in dollars and cents. Substantial equivalence satisfies the requirement of "fairness and equity" in its legal sense as used in this setting. The court should, of course, give weight to what the Commission has found,

578

and its reasons for its allocation, but I think that, if the district judge had, in this case, exercised the duty which lay upon him he would have held that there was no substantial foundation for the Commission's treatment of General Mortgage bondholders and would have been bound, therefore, to disapprove the plan. As he did not perform that duty, I think that, unless the right to come to this Court is vain, we have the duty to correct his action. I should, therefore, reverse the decree below.