JULIA HARDT, PETITIONER-RESPONDENT, v. JOHN F. CUNNINGHAM, DEFENDANT-PROSECUTOR.

Submitted January 22, 1947—Decided September 16, 1947.

Before CASE, CHIEF JUSTICE, and Justices HEHER and COLIE.

For the prosecutor, *John G. Flanigan.*

For the respondent, *David Bernheim* (*Edward J. Abromson,* of counsel).

The opinion of the court was delivered by

HEHER, J. The question here is whether there was an accident compensable under the State Workmen's Compensation Act (*R. S.* 34:15–7, *et seq.*) in these circumstances, established by stipulation of the parties and supplemental testimony:

On August 8th, 1942, the deceased employee, Peter Hardt, suffered death by an accident which arose out of and in the course of his employment with prosecutor "as a barge captain or bargeman," while the barge to which he was assigned was moored in Harrison, New Jersey, to a pier in the Passaic River, at that point a navigable water of the United States. The fatality occurred at about 10:00 P. M., in this wise, according to the stipulation: "The decedent had gone ashore from the barge and after visiting the Peanut Bar at Harrison with friends and relatives was returning to the barge and upon reaching the pier found that the tide had lowered some three feet and that the barge itself was away from the pier a distance of some three feet or so. The decedent jumped from the pier or dock to the barge, landing on the deck of the barge, in an upright position, but for some reason not

disclosed, decedent lost his balance and fell backwards into the Passaic River and died as a result of drowning. * * * There was a ladder on the barge but apparently the decedent did not take the ladder from the barge to go to the Peanut Bar some two hours or so before the accident." The decedent's niece, an eye-witness, testified that he "sat down on the edge" of the dock and "put his hands down and then he heaved." The vessel had a "narrow" walk around its outer edge; and it was upon this that the decedent "landed" when he jumped or sprang from the dock. The decedent was required to be upon the barge "all the time" day and night, termed "a twenty-four hour day;" and he was the "captain" in charge and the sole occupant of the vessel. This was the case also while the barge was in transport. It had a cabin and sleeping quarters. The decedent was paid a monthly wage of $135. But he was given no subsistence; and there was testimony that during his absence from the barge on the occasion in question he procured some provisions for a voyage to Buffalo, New York, which he was about to make on the vessel—a journey requiring between 30 and 35 days. The employer is in the marine transport business. He "is a resident of New York;" and "the home port of the barge is located in New York State." The barge was moored to the Harrison pier a day or two before the fatal accident, on its arrival from the State of New York, "and was being loaded with a cargo of scrap metal for delivery to Buffalo." As captain, the decedent had general supervision of the barge while in port and in transport. He had been in prosecutor's employ but two days when the mishap occurred. He rendered no service in the loading and unloading of the vessel's cargo, nor was he obliged to do so; and he had no shore duties. Generally, it was incumbent on him to throw, fasten and release lines at docks and in the canal locks, take the lines of the tugs and, presumably, care for the cargo. The employer testified, and there was no showing otherwise, that the decedent's duties consisted of making "the barge fast to the dock," pumping it out, placing the hatch cover after the loading of the boat, taking "general care of the barge," uncoupling the barge and making it fast to the walls of the

canal locks on the route to Buffalo, "coupling up" the barge after it had passed through the locks, "steering the boat behind the tug" in the process of moving it through the locks, thirty-five in all on the trip to Buffalo, and to light the navigation lamps at night. The vessel had no motive power' of its own; it was moved by towing.

After the reversal of a judgment of the Compensation Bureau dismissing the petition and the remand of the cause for further proceedings (23 *N. J. Mis. R.* 369; 44 *Atl. Rep.* (*2d*) 690), there was an award of compensation in the Bureau which was affirmed in the Hudson Common Pleas. The Common Pleas Judge conceived the issue to be whether the accident "happened on land or on navigable waters." He found that the decedent "jumped from the dock, landed on the barge in an unright position, lost his equilibrium, fell backward into the water and was drowned;" that although it was stipulated that the decedent "landed on the deck of the barge," he "was there only momentarily on his way from the pier to the water" and he did not reach "the barge in the usual sense which means he arrived there safely or securely," and thus the accident "originated on the land where the deceased first exerted the strength to jump and caused his body to move first to the barge momentarily and then to the water." These cases are cited in support of this reasoning: *The Alna,* 297 *Fed. Rep.* 673; *Union Oil Co.* v. *Industrial Accident Commission,* 211 *Cal.* 398; 295 *Pac. Rep.* 513; *Baldwin* v. *Linde-Griffith Construction Co.,* 115 *N. J. L.* 608.

It is urged on behalf of the employer that "the cause is maritime" and exclusively the subject of federal cognizance. The argument *contra* is that the barge "had been withdrawn from navigation," and the decedent was not a seaman within the purview of the admiralty law, as supplemented by the Jones Act (41 *Stat.* 988, 1007, *ch.* 250; 46 *U. S. C. A.,* § 688); and that "the accident arose on 'land'" and so is remediable under the State Workmen's Compensation Act.

The admiralty and maritime jurisdiction reposes in the government of the United States. Article III, section II of the Federal Constitution extends the judicial power of the United States "to all cases of admiralty and maritime juris-

diction;" and article I, section VIII confers upon the Congress authority to provide for the execution of all powers vested by the constitution in the government of the United States, or in any department or officer thereof. Section 9 of the Judiciary Act of 1789 (1 *Stat.* 76, *ch.* 20) vested in the District Courts of the United States "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, * * * saving to suitors, in all cases, the right of a common-law remedy, where the common law is competent to give it." This exclusive jurisdiction was carried into the revision of the Judicial Code of 1911, in substantially the same language. 36 *Stat.* 1091, *ch.* 231. Of the legislative history, more hereafter.

The jurisdiction of the admiralty over torts, injuries and offenses of necessity depends upon the locality of the act. In the early English admiralty, it did not extend to waters *infra corpus comitatus.* In this country, the jurisdiction in admiralty extends to acts committed on the high seas and other navigable waters. The English limitation adverted to is not applicable here. Thus, in the exercise of this jurisdiction, the federal Supreme Court distinguished between injuries occurring on land and those suffered by persons engaged in maritime employment on a vessel in navigable waters. In 1914, it was held that a stevedore engaged in loading and stowing the cargo of a ship lying in port in navigable waters was performing a maritime service, and his rights and liabilities in case of injury were matters within the admiralty jurisdiction. *Atlantic Transport Co.* v. *Imbrovek,* 234 *U. S.* 52; 34 *S. Ct.* 733; 58 *L. Ed.* 1208. Three years later, in *Southern Pacific Co.* v. *Jensen,* 244 *U. S.* 205; 37 *S. Ct.* 524; 61 *L. Ed.* 1086, the court ruled that stevedoring is maritime in nature and the extension, by express provision, of the benefits of the Workmen's Compensation Act of the State of New York to longshoremen injured while so engaged conflicted with the cited clause of the Federal Constitution, and was invalid *pro tanto.* State legislation is an invasion of the federal domain, it was there declared, "if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the

general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." This limitation, it was said, "is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the constitution itself." And it was pointed out that the remedy provided by workmen's compensation statutes "is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court, and is not saved to suitors from the grant of exclusive jurisdiction." Later on, in 1922, the court held that the local law governed in the case of a longshoreman injured on the land, although engaged in unloading a vessel, and hence the state compensation act applied. *State Industrial Commission* v. *Nordenholt Corp.*, 259 *U. S.* 263; 42 *S. Ct.* 473; 66 *L. Ed.* 933. In 1917 and 1922, there were amendments to sections 24 and 256 of the Judicial Code, purporting to save to "suitors," not only the right of a competent common-law remedy, but also "to claimants for compensation for injuries to or death of persons other than the master or members of the crew of a vessel their rights and remedies under the workmen's compensation law of any State, District, Territory, or possession of the United States, which rights and remedies when conferred by such law shall be exclusive." 40 *Stat.* 395, *ch.* 97; 42 *Stat.* 634, *ch.* 216; 28 *U. S. C. A.*, §§ 41, 371. But these amendments were declared unconstitutional as an unwarranted delegation of the legislative power of the Congress and as destructive of the uniformity which the constitution had established and thus a subversion of the constitutional grant of jurisdiction to the federal courts. *Knickerbocker Ice Co.* v. *Stewart*, 253 *U. S.* 149; 40 *S. Ct.* 438; 64 *L. Ed.* 834; *Washington* v. *Dawson & Co.*, 264 *U. S.* 219; 44 *S. Ct.* 302; 68 *L. Ed.* 646; *Nogueira* v. *New York, New Haven and Hartford Railroad Co.*, 281 *U. S.* 128; 50 *S. Ct.* 303; 74 *L. Ed.* 754.

The decision in *Southern Pacific Co.* v. *Jensen, supra,* and the cases which followed, "carved out a domain in which * * * state law could not constitutionally afford compensation to maritime employees;" and the Longshoremen's and Harbor Workers' Compensation Act (44 *Stat.* 1424, *ch.* 509;

33 *U. S. C. A.,* § 901) was adopted in 1927 "to fill that gap in the system of workmen's compensation." *Norton* v. *Warner Co.,* 321 *U. S.* 565; 64 *S. Ct.* 747; 88 *L. Ed.* 931. This statute grants compensation coverage for disability or death of "an employee" as the result of "an injury occurring upon the navigable waters of the United States (including any dry dock) * * * if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by state law," but by sections 2 (3) and 3(a) (1) excludes from such coverage "a master or member of a crew of any vessel." 33 *U. S. C. A.,* § 903. This was in keeping with the expressed preference of the seamen's unions for the remedies of the maritime law over the proposed scheme of compensation. Thus, the design of this act was to provide compensation to employees in maritime service, except a master or member of a crew of a vessel, for disability or death ensuing from injury occurring upon the navigable waters of the United States where recovery therefor through workmen's compensation proceedings might not validly be provided by state law. *Nogueira* v. *New York, New Haven and Hartford Railroad Co., supra.* By section 5, the remedy provided by the act is made exclusive. 33 *U. S. C. A.,* § 905. And so, section 33 of the Merchant Marine Act (known as the Jones Act), *supra,* granting to "seamen," at their election, the benefit of the provisions of the Federal Employer's Liability Act, has no application to those entitled to compensation under the Longshoremen's Act. This classification has a sound constitutional basis. *Nogueira* v. *New York, New Haven and Hartford Railroad Co., supra; South Chicago Coal and Dock Co.* v. *Bassett,* 309 *U. S.* 251; 60 *S. Ct.* 544; 84 *L. Ed.* 732.

Thus it is that the remedy for the injury or death of a member of the crew of a vessel upon the navigable waters of the United States lies in the maritime law as supplemented by the Jones Act, *supra.* For the remedies thus afforded, see *Norton* v. *Warner Co., supra.* The deceased employee was in that category. A barge is a vessel within the view of the Jones Act, even though it has no motive power of its own, for it is a means of transportation on water; and the "crew" may consist of the man in sole charge of the vessel

on a voyage. *Norton* v. *Warner Co., supra.* Here, the decedent, like the worker in the cited case, "performed on the barge functions of the same quality as those performed in the maintenance and operation of many vessels;" they differed from the functions of any other "crew" only "as they were made so by the nature of the vessel and its navigational requirements." This provision is to be assayed in the light of the anterior ruling that the term "seamen" included longshoremen engaged on a vessel docked in navigable waters in the work of loading or unloading. *International Stevedoring Co.* v. *Haverty,* 272 *U. S.* 50; 47 *S. Ct.* 19; 71 *L. Ed.* 157; *Northern Coal and Dock Co.* v. *Strand,* 278 *U. S.* 142; 49 *S. Ct.* 88; 73 *L. Ed.* 232. The aim of the Longshoremen's Act was to provide compensation for those who "are mainly employed in loading, unloading, refitting, and repairing ships." *Norton* v. *Warner Co., supra.*

We have no occasion to consider whether an accidental injury on land suffered by a crew member such as the decedent in going to and from the vessel for the purpose here indicated would be compensable under the State Compensation Act. Section 33 of the Merchant Marine Act, *supra,* incorporated into the admiralty law, is applicable where a seaman suffers personal injury or death "in the course of his employment." Yet, as we have seen, the state law ordinarily governs where the cause of action arises upon the land. See, also, *The Admiral Peoples,* 295 *U. S.* 649; 55 *S. Ct.* 885; 79 *L. Ed.* 1633. The fatal accident here occurred upon the water, and, since it was a navigable water, the legal consequences of the accident are determined by the maritime law. Neither a seaman nor a longshoreman engaged in loading or unloading a vessel lying in navigable waters could constitutionally have compensation under a state law for an injury sustained upon the vessel. An act of Congress so providing would constitute an infringement of the maritime jurisdiction reserved by the constitution to the government of the United States.

It was stipulated that after "landing" on the deck of the barge, in an upright position, the decedent lost his balance "for some reason not disclosed;" and the judgment of the

Common Pleas proceeds upon the hypothesis that at the moment when the decedent "lost his equilibrium," he had not yet "reached the barge * * * safely or securely." But this is a misapprehension of the law. It is not a circumstance determinative of this question that the decedent's loss of balance followed the "jump" from the dock to the barge, assuming that the finding of a causal connection is not at variance with the stipulation; it was an accident upon the water nevertheless. Loss of balance is a hazard incident to the boarding of a boat in such circumstances. The early cases ruled that the admiralty had jurisdiction where the injury occurred while the victim was disembarking by a ladder or gangplank connecting the vessel with the shore, before he was entirely free from the ship and had safely reached the shore, but that in boarding a vessel the jurisdiction of admiralty did not attach until the person had reached the ship, and was entirely separated from the shore. *The Atna, supra.* But this was an arbitrary formula that seemed to ignore the essentials of admiralty jurisdiction under the constitution; and eventually the ladder or gangplank provided for ingress or egress to or from the ship came to be regarded as a part of the ship's equipment and one so using it for ingress or egress as at the time within the admiralty jurisdiction. *Vancouver S. S. Co.* v. *Rice,* 288 *U. S.* 445; 53 *S. Ct.* 420; 77 *L. Ed.* 885; *The Admiral Peoples, supra; Brady* v. *Roosevelt Steamship Co.,* 318 *U. S.* 575; 63 *S. Ct.* 425; 87 *L. Ed.* 471; *Fan Shen Hung* v. *Prestlein,* 88 *Fed. Rep.* (2d) 42; *certiorari* denied, *Fan Shan Hang* v. *Prestlein,* 301 *U. S.* 705; 57 *S. Ct.* 938; 81 *L. Ed.* 1359; *Kibadeaux* v. *Standard Dredging Co.,* 81 *Fed. Rep.* (2d) 670; *Ford* v. *Parker,* 52 *Fed. Supp.* 98; *Richard* v. *Monahan,* 17 *Id.* 252; *The Berwindglen,* 14 *Id.* 992.

As we have seen, jurisdiction in admiralty over torts and injuries of this class depends upon the locality of the injury; and, after all, the ultimate and basic test is whether the injury occurred on the land or on navigable water. Did the substance of the injury originate on the land or on navigable water in the sense that its consummation somewhere was inevitable? Here, the substance and consumma-

tion of the wrong or injury took place on navigable water and not on the land. The decedent "landed" in an upright position upon the barge after he "jumped" from the dock. Whether the loss of equilibrium was due to the movement of the vessel upon the water, or from another cause, we have no way of knowing; but, whatever the reason, the mishap was in essence an occurrence upon the water remediable under the maritime law only. There was not, in the "jump" from the dock to the vessel, the commencement on the land of inevitable injury. The drowning of the decedent was not the result of an accident upon the land, but rather the consequence of his fall from the vessel; and this was just as much a mishap upon the water as if the fall had occurred while the decedent, in boarding the barge, was using a ladder provided for the purpose—even more so, for the fatal fall was from the vessel itself. Nothing happened on the land; the decedent merely left the dock by a somewhat perilous course, disregarding the established means for safety in making the passage, although his niece, her father and her cousin "jumped" from the dock to the barge without incident immediately after the mishap. What was done here was not the less within the admiralty jurisdiction because the decedent sought to board the vessel without the use of the ladder supplied for that purpose. Workers whose duties oblige them to board and leave vessels on navigable waters are in those endeavors engaged in what is essentially a maritime activity.

While this is a borderline case, it is not referable to the marginal area arising from the blending of federal and state jurisdictions where the individual case suggests characteristics of both and so does not lend itself to absolute classification, and the doctrine of *Davis* v. *Department of Labor*, 317 *U. S.* 249; 63 *S. Ct.* 225; 87 *L. Ed.* 246, has no pertinency. There, the employee was a structural steel worker whose employer was subject to the State Compensation Act, but who at the time was engaged in the performance of a contract for the dismantling of an abandoned drawbridge which spanned a navigable river—essentially a land structure. The workman was employed to aid in the cutting of the steel, both on the bridge itself and on the barge underneath to which

the cut steel had been removed for towage to a storage point. The activity was in the main of a local rather than a maritime nature. Compare *Martin* v. *West,* 222 *U. S.* 191; 32 *S. Ct.* 42; 56 *L. Ed.* 159; *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 *U. S.* 469; 42 *S. Ct.* 157; 66 *L. Ed.* 321; *Ford* v. *Parker, supra; DeGraw* v. *Todd Shipyards Co.,* 134 *N. J. L.* 315. And in the Davis case, the State Compensation Act, unlike our own, applied to "all employees or workmen * * * engaged in maritime occupations for whom no right or obligation exists under the maritime laws." The general presumption of constitutionality in favor of the state statute was invoked to sustain the state action in a case involving "doubtful and difficult factual questions," where there was "no conflicting process of administration." The federal authorities had taken no action under the Longshoremen's Act; and it was not shown that the employer had made the special payments required by the act or controverted payment in the manner therein prescribed. The "twilight zone" was held to include "persons such as the decedent who are, as a matter of actual administration, in fact protected under the state compensation act." This conception does not do violence to "the characteristic features of the general maritime law" or the uniformity of its operation. *Southern Pacific Co.* v. *Jensen, supra.*

The judgment of the Common Pleas is reversed, without costs; and, since the facts have been stipulated, the cause is remanded with direction to dismiss the petition for compensation.