In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

Claim of Richard Joyce SMITH, Trustee of the N. Y., N. H. & H. Railroad.

No. 70-347.

United States District Court, E. D. Pennsylvania.

Dec. 31, 1971.

As Amended Jan. 7, 1972.

780

Edwin K. Taylor, and John DePodesta, Philadelpia, Pa., Counsel to the Trustees, Penn Central Transportation Co., and Covington & Burling, by Charles A. Horsky, and Brice M. Clagett, Washington, D. C., Special Counsel to the Trustees, Penn Central Transportation Co.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Dechert, Price & Rhoads, by Norma L. Shapiro, Philadelphia, Pa., for Penn Central Co.

James William Moore, New Haven, Conn., and Sullivan & Worcester, by Joseph Auerbach, and Morris Raker, Boston, Mass., and Tate & Ervin, by Spencer Ervin, Jr., and W. Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad.

Willkie, Farr & Gallagher, by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Central Group.

Drinker, Biddle & Reath by Jack B. Justice, Philadelphia, Pa., for Girard

Trust Bank, Chase Manhattan Bank, and Brown Brothers Harriman & Co.

Kelley, Drye, Warren, Clark, Carr & Ellis, by Edward Roberts, III, New York City for Manufacturers Hanover, as trustee under certain mortgages of the debtor.

Ballard, Spahr, Andrews & Ingersoll, by Morris Cheston, Jr., Philadelphia, Pa., for Girard Trust Bank, indenture trustee.

Davis, Polk & Wardwell, by Stephen H. Case, New York City, for Morgan Guaranty Trust Company of New York, as trustee.

Cohen, Shapiro, Polisher, Shiekman & Cohen, by Harold Greenberg, Philadelphia, Pa., for New York, New Haven & Hartford Railroad Company First Mortgage 4% Bondholders Committee, Manufacturers Hanover Trust Company, trustee and Simpson, Thacher & Bartlett, by Albert X. Bader, Jr., New York City, for Manufacturers Hanover Trust Company, trustee and Migdahl, Low, Tenney & Glass, by Lester C. Migdahl, and Lawrence W. Pollack, New York City, for New York, New Haven & Hartford Railroad Company First Mortgage 4% Bondholders Committee.

Dewey, Ballantine, Bushby, Palmer & Wood, by Stuart N. Scott, New York City, for Chase Manhattan Bank, trustee.

William E. Nelson, Washington, D. C., for the Department of Justice.

Leonard S. Goodman, Washington, D. C., for the Interstate Commerce Commission.

## OPINION

FULLAM, District Judge.

The Trustees have petitioned for determination of the issues raised by the proof of claim filed by the reorganization Trustee of the New York, New Haven and Hartford Railroad Company (hereinafter "New Haven Trustee"), and certain related applications by the Trustees for interim relief. The claim in question is an outgrowth of the litigation which culminated in the decision of the Supreme Court in the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). The New Haven Trustee asserts that these issues have already been decided by the United States District Court for the District of Connecticut, which has jurisdiction over the New Haven reorganization.

### I. Background

On March 6, 1962, the Pennsylvania Railroad Company and the New York Central Railroad Company made application to the Interstate Commerce Commission under Section 5(b) of the Interstate Commerce Act (49 U.S.C. § 5(b)(1)) for approval of a proposed merger of the two railroads into what ultimately became the Penn Central Transportation Company, the Debtor herein.

On June 26, 1962, the New Haven, then in reorganization for the second time in less than 20 years, sought inclusion in the merger. Eventually, over the objections of the merger proponents, the Commission, by its order of April 6, 1966, made its approval of the merger conditional upon inclusion of the New Haven, on terms to be negotiated by the parties, subject to the approval of the I.C.C. and the New Haven reorganization court. 327 ICC 475, 553. It was recognized that any attempt to recapitalize the New Haven and include it as an operating company would be pointless, in view of its hopelessly deteriorating financial condition. Accordingly, the outright sale of the New Haven's assets was the method of inclusion selected. This transaction was to constitute the first step of a two-step reorganization plan for the New Haven. New Haven Inclusion Cases, 399 U.S. 392, 410 at n. 45, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

The New Haven Trustee and the merger proponents originally agreed that a fair purchase price for the New Haven assets would be $125,000,000. The Commission also approved this price,[1] which

---

[1.] 331 ICC 627, 692.

was to be paid by a "package" consisting of $8,000,000 in cash, $23,000,000 in (divisional) first mortgage bonds, the assumption of certain New Haven liabilities, closing adjustments, and the issuance of shares of common stock in the new corporation. The parties, and the Commission, valued the common stock at $87.50 per share; thus the stock constituted the major part of the consideration flowing to the New Haven estate. It is conceded that this feature of the transaction was eagerly sought by the New Haven estate.

While the transaction as thus formulated was designed to produce the equivalent of $125,000,000 for the New Haven estate, the Commission further found that it would cost Penn Central the equivalent of $157,000,000, largely because of the interim and continuing losses of the New Haven which the Penn Central would be required to assume. Thus, Penn Central would pay $157,000,000 in exchange for assets having only negative earning power. But, apparently convinced that the merger would "save" upwards of $80,000,000 per year, the Commission concluded that the inclusion of the New Haven on the above terms "would be both 'just and reasonable' as a condition of the merger under § 5 . . . and 'fair and equitable' as part of a plan of reorganization under § 77. . . ." New Haven Inclusion Cases, 399 U.S. 392, 413, 90 S.Ct. 2054, 2069, 26 L.Ed.2d 691 (1970).

At this point, procedural complications developed. The I.C.C. order was subject to dual review: in the Connecticut District Court, and in a three-judge statutory court in the Southern District of New York. The former had jurisdiction over the reorganization of the New Haven, the latter over the merger (and the related inclusion) under § 5 of the Interstate Commerce Act. Appeals were taken to both courts, by New Haven creditor groups asserting that the price was too low, and by various parties opposed to the merger, the New Haven inclusion, or both.

The Connecticut Court concluded that the New Haven assets were worth between $33,000,000 and $55,000,000 more than the agreed price, In re New York, N. H. & H. R. R. Co., 289 F.Supp. 451, 465 (D.C.Conn.1968), while the merger court concluded that the deficiency was in the range of $45,000,000 to $50,000,000. New York, N. H. & H. R. R. Co., First Mtg. 4% Bondholders' Committee v. United States, 289 F.Supp. 418, 440 (S.D.N.Y.1968).

On remand, again in a combined proceeding involving both the merger and the reorganization, the I.C.C. increased the price by some $37,700,000, but allowed certain further deductions totaling $22,100,000, thus producing a net price increase of $15,600,000. The total price set by the Commission was approximately $145,600,000. The increase was to be paid by issuing $7.4 million more of divisional mortgage bonds, and by assuming certain additional liabilities.

By this time, the New Haven was in such desperate straits that cessation of rail services appeared imminent. Accordingly, the I.C.C. concluded that the assets should be immediately transferred to Penn Central, and Penn Central should be required to take over the New Haven's operations, without awaiting final judicial review of the price. This was accomplished, pursuant to the I.C.C. opinion and an order of the New Haven reorganization court, as of December 31, 1968, by an outright conveyance to Penn Central "free and clear of liens." The price set by the I.C.C. was paid, subject to adjustment on appeal.

On the second round of appeals, the merger court generally upheld the I.C.C., but made some adjustments which increased the price by about $990,000. New York, N. H. & H. R. R. Co., First Mtg. 4% Bondholders' Committee v. United States, 305 F.Supp. 1049 (S.D. N.Y.1969). This, too, was paid. However, the reorganization court increased the price by some $29,000,000. In re New York, N. H. & H. R. R. Co., 304

F.Supp. 793 and 304 F.Supp. 1136 (D. Conn.1969).

When the merger was originally approved in 1966, in hearings before the I. C.C. the median price projected of Penn Central Stock was $87.50. By the time of the conveyance of the New Haven assets on December 31, 1968, the price had declined to an average of about $69.50 per share, *see*: New Haven Inclusion Cases, 399 U.S. at 485, 90 S.Ct. 2054, 26 L.Ed.2d 691, but all concerned apparently felt that the long-range benefits of the merger would improve the market. Accordingly, in authorizing the New Haven Trustee to accept 950,000 shares of Penn Central stock as representing payment of $83,125,000 of the purchase price, the Connecticut court imposed on Penn Central an underwriting plan which in effect required Penn Central to guarantee that the stock would reach $87.50 per share by February 1, 1978; otherwise, Penn Central would pay the New Haven Trustee the difference in cash. *See* 304 F.Supp. at 808–810.

Appeals from the orders of both courts were pending before the Supreme Court when the Penn Central went into bankruptcy. Eight days later, on June 29, 1970, the Supreme Court decided the pending appeals. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). The Court (a) affirmed the New Haven reorganization court's determination that the correct price for the New Haven assets was $174,000,000; (b) vacated that part of the reorganization court's judgment which set up the underwriting plan; and (c) directed the merger court to abstain "pending the further proceedings before the I.C.C. and the reviewing courts under Section 77 of the Bankruptcy Act."

As can be seen from the foregoing recital, there were two separate issues involved throughout these proceedings: the value of the New Haven assets, and the value of the consideration to be furnished by Penn Central. When the I.C.C. and the lower courts considered the case, the value of the assets was decreasing, even negative; whereas the value of the consideration was thought to be likely to increase. By discarding going-concern, or income-producing, approaches, and choosing a liquidation hypothesis, the reorganization court established a floor under the declining asset value. And its underwriting provision was designed to insure that the consideration value would correspond to the price thus fixed.

By the time the Supreme Court decided the case, it was apparent that the underwriting scheme was no longer feasible.

## II. *The Issues*

Before attempting to discuss the precise extent of this Court's jurisdiction and the desirability *vel non* of its exercise, it may be helpful to review the issues which, in consequence of the Supreme Court's decision, remain open for further consideration. Unfortunately, even this subject is not free from doubt.

It is clear that the value of the New Haven assets which were conveyed to Penn Central as of December 31, 1968, has been finally and unalterably fixed at $174,000,000. If the "package" of consideration previously furnished by Penn Central were to be valued as of the time of payment and treated as an accomplished fact, then the only remaining issue would be the form of payment of the $28,000,000 balance. But the Court has expressly stated that, in the light of intervening events, the underwriting scheme which was designed to produce a value of $87.50 per share of the common stock "may be wholly unrealistic." From this it can be argued, either that the Court intended that only the underwriting scheme should be reconsidered, or that the true value of the "package" as of December 31, 1968, should be reappraised in the light of subsequent events, or that the entire "package" should be reevaluated as of present day values. There is language in the Court's opinion which can be construed as lending support to each of these possible constructions.

The Court stated, 399 U.S. 392, at p. 489, 90 S.Ct. 2054, at p. 2108:

"Accordingly, we set aside the order of the Connecticut District Court *insofar as it determines that an intrinsic value of $87.50 inheres in the Penn Central common stock and implements an underwriting plan to secure payment of that sum.* Further proceedings before the Commission and the appropriate federal courts will be necessary to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." [emphasis added]

However, immediately preceding this language, the Court stated (pp. 488–489, 90 S.Ct. p. 2108):

"The fairness and equity that are the essence of a Section 77 proceeding forbid our approval of a payment for the transferred New Haven properties that may be worth only a fraction of its purported value. And the same considerations of fairness and equity prevent imposing on Penn Central the burden of immediate payment in full, particularly when it is remembered that the New Haven bondholders have never objected to the receipt of Penn Central stock in exchange for the New Haven assets."

Elsewhere (at pp. 489–490, 90 S.Ct. at p. 2108), in discussing the constitutional rights of the bondholders, the Court stated:

". . . The purchase price that the Commission and the reorganization court have required Penn Central to pay to the New Haven estate is based upon the liquidation value of the seller's assets, appraised as of December 31, 1966. That price hypothesizes a shutdown of New Haven followed by a sell-off of its assets at their highest and best value. In the circumstances of this case, and for the reasons we have already set out at length, we agree with the reorganization court that it would be unfair and inequitable to allow Penn Central to take the properties for any lesser sum. Moreover, *we today require a reassessment of the consideration* that Penn Central is to give in exchange for those properties. We thereby accord the bondholders the right to a liquidation and a per-parcel sale that is theirs by virtue of their mortgage lien. . . ." [emphasis added]

And finally, there is at least surface inconsistency between the Court's language at page 488, 90 S.Ct. at page 2107:

". . . But we cannot avoid the impact of recent events in assessing the propriety of the decree that [the reorganization] court has entered. . . ."

and the express disclaimer set forth in a prefatory footnote in which, after noting the commencement of Penn Central's reorganization proceeding, the Court stated:

"Whether the financial obligations dealt with in the present opinion may become subject to modification in or because of those proceedings is a question with which the present opinion in no way deals."

In view of the fact that the opinion was filed shortly after Penn Central's bankruptcy, and that the implications of the bankruptcy had not been briefed or argued, it may well be that the "recent events" mentioned in the text referred to the pre-bankrupcty decline in Penn Central's fortunes, and not to the bankruptcy itself. Another possible way to reconcile these two comments might be to construe the Supreme Court's mandate as directing that the underwriting scheme, or the valuation of the entire package of consideration, must be reconsidered by reason of the intervening bankruptcy, but without any attempt on the part of the Court to suggest what effect, if any, the intervening bankruptcy should have on the result. Or, the Court may merely have wished to make clear that, whatever the outcome of its mandated reevaluation, various parties in interest in the Penn Central

reorganization proceeding would still be able to challenge it in this reorganization proceeding.

To summarize, the issues which remained to be decided after the Court's action include at least (1) the method of payment of the $28,000,000 increase; (2) the underwriting scheme, or a substitute therefore; (3) whether the stock transaction can or should be rescinded, or recast; (4) whether the New Haven estate can or should be accorded the status of a secured creditor with respect to some or all of the further consideration to be furnished; and (5) the treatment to be accorded whatever claims emerge from decision of the foregoing issues, in the Penn Central bankruptcy proceeding.

### III. Post-Bankruptcy Events

Since the opinion of the Supreme Court was handed down, the litigation has followed a potentially awkward course both in this court and in the Connecticut court, generating the specific controversies which this court is now asked to consider. In this court, the New Haven Trustee, in May of 1971, filed a proof of claim, as a secured creditor, in the sum of $132,000,000. This amount was arrived at by deducting from the $174,000,000 total purchase price approved by the Supreme Court the various cash payments which have been made, and certain obligations assumed by Penn Central. Thus, the New Haven proof of claim asserts that the New Haven is a secured creditor for the full balance of the purchase price, plus interest thereon, without any adjustment for the 950,000 shares of Penn Central stock.

The Connecticut court filed an opinion and on June 11, 1971, entered an order,[2] which, in remanding the case to the Interstate Commerce Commission, imposed an "equitable lien" in favor of the New Haven, upon all of the former New Haven assets conveyed to Penn Central (except rolling stock) for the full balance

of the purchase price (i. e., $174,000,000, less cash payments on account and obligations assumed); declared the existence of a "constructive trust" in one-half of the income from the Grand Central Terminal properties in New York, in the sum of $28,000,000; concluded that the 950,000 shares of Penn Central stock and the Divisional First Mortgage Bonds which were part of the original purchase price paid in 1968 should now be regarded as being held merely as security for the payment of the full balance; and directed the Interstate Commerce Commission to implement these provisions in carrying out its mandate. The Connecticut court also, acting on its own motion, designated a named attorney as the representative of the court to take immediate steps to record the "equitable lien" wherever necessary under state law, in the four states in which the former New Haven assets were thought to be located. An appeal from these orders is now pending before the Court of Appeals for the Second Circuit.

The Trustees of the Debtor sought interim relief in this Court from certain aspects of the Connecticut court's order. By order No. 296, this request was granted in part, in an order directed only to the litigants, and those in privity with them, and designed only to preserve the status quo pending ultimate resolution of these issues, by prohibiting any attempts to exact payment. An appeal from this order is now pending before the Court of Appeals for the Third Circuit.

At the same time, the Trustees filed the present application, seeking an immediate determination by this court of the merits of the New Haven Trustee's proof of claim. At the hearing on this application, the New Haven Trustee relied solely upon the opinion and order of the Connecticut court in support of its proof of claim. (Tr. 2730.)

 It would be naive to ignore the potential for unseemly conflict between

2. See: In re New York v. N. H. & H. R. R. Co., 330 F.Supp. 131; 331 F.Supp. 212 (D.Conn., 1971).

courts of coordinate jurisdiction which inheres in these circumstances and events. On the other hand, however, care must be taken not to exaggerate or unduly emphasize such potential conflict. Where related controversies, or different aspects of the same controversy, are properly presented to two courts for decision, it is sometimes necessary for both courts to express their views. *Cf.* Dellinger v. Mitchell, 442 F.2d 782, 787–788 (D.C.Cir.1971). The applications now pending in this court cannot be simply ignored, and they cannot be disposed of without considering the jurisdictional and other issues presented. The unique and complex relationship between the two reorganization proceedings, in my judgment, makes it necessary for both courts to decide their respective portions of the issues presented, in the interests of expediting final and conclusive resolution of all of the issues involved in the entire litigation. Every reasonable effort should be made, of course, to minimize differences.

### IV. *Jurisdiction*

As noted above, the Supreme Court held that "further proceedings before the Commission and the appropriate federal courts will be necessary to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." From the use of the plural ("courts"), and the fact that the Supreme Court directed the merger court to abstain, it can be argued that the opinion contemplated that this court would be involved in the ultimate determination of some or all of the issues remaining open. Nevertheless, it must be recognized that the litigation in which the opinion was rendered did not originate in this court, and that the Supreme Court's mandate was directed to the Connecticut court. In view of the language quoted above, and the disclaimer in the prefatory footnote at the beginning of the Supreme Court's opinion, this much at least is certain: the Supreme Court

has not suggested that this court should refrain from carrying out its functions under the reorganization statute.

In the ordinary course of reorganization, this court, pursuant to Section 77(c) (7) of the Bankruptcy Act, is required to determine the amount of an unliquidated debt, decide whether the claim is secured or unsecured, and classify the various claimants "according to the nature of their respective claims and interests" for purposes of the reorganization plan. 5 Collier on Bankruptcy, §§ 77.20, 77.21; 6A Collier on Bankruptcy, § 9.02. In carrying out these functions, this court would be bound by principles of *res judicata* and full faith and credit. To the extent that the judgment of the Connecticut court became final, either before bankruptcy or by virtue of the Supreme Court's affirmance shortly after bankruptcy, no question arises. But to the extent that additional obligations are sought to be imposed, or additional liens created, after Penn Central's bankruptcy, without the consent or approval of this Court, very serious jurisdictional questions appear. The Trustees have never been made parties to the proceedings in the Connecticut District Court, nor has anyone sought leave of this court to proceed against them in that regard.

Perhaps this is but another way of pointing out that, since the New Haven assets were conveyed to Penn Central free and clear of all liens, including all claims of the New Haven estate, on December 31, 1968, and since they remained in the ownership and possession of Penn Central on the date of bankruptcy, the filing of Penn Central's reorganization petition vested exclusive jurisdiction over these assets in this court, and made it jurisdictionally impossible for any other court to impose liens upon them, except with the approval of this court.

Counsel for the New Haven Trustee suggested at oral argument that one solution to this impasse would be for this court now to authorize and direct the

Trustees to subject themselves to the jurisdiction of the New Haven court, and thereafter for this court to abstain until final appellate determination in the Second Circuit proceedings. While the thought of allowing the cup thus to pass has considerable appeal, this approach contains its own grave difficulties. In the first place, by the time this suggestion was made, the proceedings in the Connecticut District Court had, to all practical intents and purposes, already terminated.[3] Whether something could have been, or could now be, done to overcome this difficulty need not now be considered. For the due process rights of the Penn Central creditors present a more serious problem.

It is no answer to state that the Trustees act as representatives of the creditors of Penn Central. In a sense this is true, inasmuch as the Trustees do have the obligation to preserve the Debtor's estate for the benefit of all concerned. But the Trustees cannot adequately represent one or more groups of creditors in disputes involving relative priorities of claims.

■ To the extent that the New Haven Trustee seeks a post-bankruptcy adjudication which would transform its $83.1 million stock transaction into a secured claim, create a further secured claim in the sum of $28,000,000, plus interest on the aggregate sum, and establish some further type of security ("constructive trust") in certain current income of the Debtor, I am convinced that the various creditor interests of Penn Central have an absolute constitutional right to be heard before final decision.[4] I am also satisfied that the only forum

in which these interests now can (or, conveniently, ever could) be heard is in the context of the Penn Central reorganization.

Any railroad reorganization proceeding is a complex form of litigation, and has many aspects. The New Haven reorganization is no exception. For present purposes, the Connecticut proceedings can be seen as involving the formulation and implementation of a plan of reorganization of the New Haven, a mandate from the Supreme Court, and litigation which was pending on the date of Penn Central's bankruptcy, in which claims are being asserted against Penn Central. This court has no direct concern with the first two of these three aspects, and should clearly refrain from taking any action which might infringe upon the jurisdiction of the Connecticut court. However, insofar as new or additional claims are being asserted therein against the Debtor's estate, I am required to decide whether the assertion of these claims in that forum should be permitted to continue, in view of the Penn Central bankruptcy and the stay of suits provisions of Order No. 1 herein.

As between the New Haven Trustee and the Debtor, these claims, notwithstanding their unusual ramifications, are essentially pre-bankruptcy claims, contractual in nature. They were submitted to the jurisdiction of this court when the New Haven Trustee filed his proof of claim in these proceedings, an event which occurred before the Connecticut court's adjudication.

The leading case involving the jurisdictional interplay between two railroad reorganization courts is Warren v. Palm-

---

3. The Trustees did appear in some limited fashion in the Connecticut proceeding. The extent of this participation and the procedural adequacy of the proceedings are among the issues now pending on appeal in the Second Circuit.

4. New or additional credit aggregating hundreds of millions of dollars was extended to Penn Central between December 31, 1968, and the date of bankruptcy. Additional obligations, both secured and

unsecured, were incurred. These creditors may be able to establish that they relied in part upon the "free and clear" (former) New Haven assets, and that actual or constructive notice that the full purchase price was not finally settled would not constitute notice of a potential retroactive lien, especially with regard to payments already made. At least, their opportunity to attempt such proof cannot be foreclosed.

er, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (1940). The Court held that the reorganization court which had jurisdiction over the debtor in possession of leased lines could impose liens on the leased property for operating expenses, notwithstanding the fact that the lessor was also in reorganization in another court. Since the case involved largely post-bankruptcy issues, and liens which were necessary for the continued operation of rail service, the decision is not not directly apposite. However, to the extent that it does bear on the present situation, it lends support to the position of the Penn Central Trustees in this case.

Whether the present issue be regarded as a question of the exercise of this Court's discretion as to whether or not to stay pending litigation in another jurisdiction, or, independently of the "stay of suits" question, the determination as to which of two reorganization courts is the preferable forum, I am constrained to reach the somewhat uncomfortable conclusion that the ultimate decision depends to a large extent upon the result which has been or may be reached in the other jurisdiction. The usual standards to be applied in this situation—impact on the formulation of a reorganization plan and the continuance of rail service, *cf.* Warren v. Palmer, *supra*; Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), and impact on this court's interim administration of the reorganization proceeding, *see* Congress of Railway Unions, et al. Appeal, 446 F.2d 1109 (3d Cir., July 16, 1971)—must be assessed in light of the actual or threatened outcome of the pending litigation.

If the Connecticut court had simply remanded the matter to the Interstate Commerce Commission, the "form" of Penn Central's consideration and the "status" of the New Haven would presumably be determined by the Commission simultaneously in both the New Haven reorganization proceeding (including the remnants of the merger case) and in the Penn Central reorganization proceeding. It is reasonable to assume that these initial determinations would have been internally consistent. Review would then be available, in the Connecticut court in the New Haven proceeding, and in this court in the Penn Central proceeding. If the two courts then viewed the issues differently, there might be separate appeals in the two proceedings, the parties might agree upon a single appeal, or one court might defer to the other. Since the decision of each court would have had its genesis in a proceeding in which all concerned were heard, some form of unification of the appeal process would probably be feasible. Moreover, there is every reason to suppose that the Commission, which is, after all, primarily responsible for the formulation of reorganization plans, *see* Group of Institutional Investors v. Chicago, Minneapolis, St. Paul and P. R. Company, 318 U.S. 523, 544, 63 S.Ct. 727, 87 L.Ed. 959 (1943); Reconstruction Finance Corporation v. Denver and Rio Grande and Western Railroad Company, 328 U.S. 495, 530, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946), might be expected to resolve these issues in a manner which would withstand attack in both courts. As matters now stand, however (depending in part upon the outcome of the pending appeal in the Second Circuit), it is difficult to see how the Commission, confronted with the order of the Connecticut court, could properly perform its function in either proceeding.

I hasten to emphasize that the Connecticut court has made it clear that it does not view its order as in any way controlling the ultimate disposition of the New Haven Trustee's claim in the reorganization plan of the Penn Central. However, this assurance can be, and is widely interpreted by Penn Central creditor groups as being limited to the notion that the New Haven Trustee's ultimate participation in a reorganized Penn Central would be determined in the Penn Central reorganization proceeding. The recalculated amount of the New Haven Trustee's claims, and their character as secured or unsecured, are a different

matter; yet these are the critical determinations insofar as Penn Central's other creditors are concerned.

While the existence of a declared lien would ordinarily have little adverse effect upon the interim conduct of the reorganization process, if it were subject to reconsideration in the ultimate reorganization plan, the fact remains that in this case, unless the declared lien is to be simply disregarded, difficult and burdensome accounting procedures might be required. To the extent that the lien purportedly attaches to all of the former New Haven assets (except rolling stock), whether real or personal, thus apparently even including office furniture and supplies, the interference with the orderly process of the reorganization and the operations of the Debtor in the interim is potentially quite substantial. Further, obvious difficulties arise with respect to that part of the Connecticut court's order which imposes a "constructive trust" upon substantial amounts of income now available to the Trustees for operating expenses.

For all of these reasons—the seeming incompleteness of the Connecticut court's jurisdiction, the exclusive jurisdiction of this court over the assets in the possession of the Debtor, and the probable impact upon the reorganization proceedings and the ultimate reorganization plan for Penn Central—if the issues were being presented to this court for completely independent decision, I should be inclined to stay the prosecution of these claims by the New Haven Trustee in other forums. But the Connecticut court's determination of its own jurisdiction is entitled to great weight. Considerations of comity, and due deference to the views of an eminent jurist of exceptional experience in these matters, alike dictate that every effort be made here to avoid reaching a result which might further complicate matters, or seem to interfere unduly in the other related proceeding.

When the case was before the Supreme Court, the basic issues were whether the inclusion terms were "just and reasonable" under § 5 and "fair and equita-

ble" under § 77. The Court held that, inasmuch as Penn Central had agreed to the inclusion, the issue was essentially the same under both statutes, and involved the valuation of the New Haven assets, a task peculiarly within the jurisdiction of the New Haven reorganization. I shall assume that the § 5 criterion is no longer open for consideration. But in the present posture of the case, determining what is "fair and equitable" from the standpoint of the New Haven reorganization, or even from the joint standpoint of the New Haven reorganization and a solvent Penn Central in private management, is not necessarily the same as determining what is "fair and equitable" in the total context of both reorganizations.

In short, the result of the ultimate decision of the substantive issues raised here must appear to the Connecticut court to be consistent with a "fair and equitable" plan for the New Haven, and must also appear to this court to be consistent with a "fair and equitable" plan for the Penn Central. Neither court can delegate this decision to the other, nor would abstention be permissible.

Accordingly, it seems appropriate to view the Connecticut court's order of June 11, 1971, as essentially constituting a declaration of what would be consistent with a fair and equitable plan for the New Haven reorganization. But it does not, and in my view cannot, constitute a binding determination of what would be consistent with a "fair and equitable" reorganization of Penn Central.

Determining the components which will go to make up the present liquidated amount of the New Haven claims is one thing; deciding whether the various components are all entitled to the same priority is quite another.

In my judgment, the only conclusion which need now be expressed is that, whatever may be the situation as between the New Haven Trustee and the stockholders of the Debtor, I do not consider that any issues of relative prior-

ity, or of amount (except for the additional $28,000,000), have been determined with finality insofar as other creditors of Penn Central are concerned.

## V. *The Merits*

As stated at the outset, the trustees are pressing for an immediate ruling on the proof of claim filed in these proceedings by the New Haven Trustee. They have presented extensive argument to the effect that the lien is without legal or equitable basis, is contrary to the law of all of the states in which the property is located, and is otherwise invalid. No doubt the decision of the Second Circuit in the pending appeal will be instructive, or even dispositive, as to many of these issues.

As I view the matter, however, the merits of this claim cannot properly be determined on the present record, in any event. The present posture of the proof of claims program is such that, although the deadline for filing proofs of claim has passed, and the claims which have been filed are being classified and processed, complete lists of the claims have not yet been made a matter of record, and the deadline for filing objections to claims has not yet been fixed. While various creditor interests did get notice of the hearing on the present petition, and some creditor groups have expressed their views on the merits of the New Haven claim, many parties potentially affected thereby have had neither notice nor opportunity to express their views. I refer specifically to the unsecured creditors, who seemingly would be most directly affected by the outcome.

Moreover, as a practical matter, if a plan for Penn Central can be devised which makes adequate provision for all creditors, whether secured or not, the New Haven Trustee's claims will diminish in poignancy. And the underlying constitutional issues can be more clearly perceived and dealt with after the various valuation studies now in progress are completed.

It is a reasonable supposition that the principal objectives of the current efforts by the New Haven Trustee are (a) to insure that he will have standing to object to the sale or other disposition of any substantial portion of the former New Haven assets, or the proceeds of such sales; (b) to provide protection in the event the Penn Central reorganization proceeding is dismissed; and (c) to insure preferred status in the event Penn Central's reorganization plan does not contain adequate provisions for unsecured claims. As set forth earlier, I am satisfied that none of these matters can be finally determined except in these proceedings after all parties in interest have had an opportunity to be heard. However, I see no reason why reasonably adequate interim protection should not be afforded the claims of the New Haven Trustee.

Accordingly, I have concluded that, pending final determination of all of the issues involved in the appropriate forum or forums, and unless and until otherwise ordered by this court or by an appellate court of competent jurisdiction, the New Haven Trustee shall be deemed to have a tentative lien, indeterminate in amount, upon all real property and all readily identifiable personal property (except rolling stock) formerly owned by the New Haven estate and conveyed to the Penn Central as of December 31, 1968, which were still in possession of the Debtor's estate on June 11, 1971. The provisions of Orders Nos. 78 and 192 shall be applicable. This, of course, does not constitute the expression of any view as to the merits of the claim or the asserted lien. The restraints imposed by Order No. 296 will remain in effect.

In order to promote the orderly and expeditious resolution of all of the issues surrounding the New Haven's claims, this court will, on application, at such time as the remand of the inclusion litigation to the I.C.C. becomes effective, certify to the Commission, for its recommendations and report, any appropriate question relating to the valuation and proper treatment of the claims of the New Haven Trustee, including, by way of illustration: (1) The value of the

various items of consideration transferred by Penn Central, on the respective dates of transfer, if no value is attributed to Penn Central's obligations under the underwriting agreement; (2) The value of Penn Central's obligations under the underwriting agreement, reappraised in the light of subsequent events; (3) The separate components of a presently fair and equitable consideration package, and the values of each.

In all other respects, disposition of the issues committed to this court must await the normal processing of the New Haven Trustee's proof of claim.

### ORDER NO. 546

AND NOW, this 31st day of December, 1971, it is ORDERED:

1. That, without prejudice to the ultimate resolution of the merits of the claims asserted, the Trustee of the New York, New Haven & Hartford Railroad shall, unless and until otherwise ordered by this Court or an appellate court of competent jurisdiction, be deemed to have a lien, indeterminate in amount, and indeterminate as to priority, upon all of the real property and readily identifiable tangible personal property (exclusive of rolling stock) conveyed to Penn Central by the said New Haven Trustee as of December 31, 1968, and remaining in possession of the Trustees of the Debtor as of June 11, 1971.

2. That the provisions of Orders Nos. 78 and 192 shall be fully applicable to transactions respecting said assets.

3. That the restraints imposed by Order No. 296 shall remain in effect until further order of this Court.

4. That this Court will entertain applications for reference of appropriate issues to the Interstate Commerce Commission in accordance with the views expressed in the foregoing Opinion.

5. That the ultimate disposition of the claims asserted by the New Haven Trustee is deferred pending completion of the program for handling proofs of claim in these proceedings, and the receipt and consideration of objections in accordance with such program.