## In re TINTI CONSTRUCTION COMPANY, INC. Brooke Construction, Inc., Debtors.

### Bankruptcy Nos. 83–01448, 83–01447.

United States Bankruptcy Court,
E.D. Wisconsin.

May 27, 1983.

Louis R. Jones, Jones & Feldner, Milwaukee, Wis., for debtors.

Frederick Perillo, Goldberg, Previant, Uelmen, Gratz, Miller & Bruggeman, S.C., Milwaukee, Wis., for Carpenters' Dist. Council, etc.

## DECISION

DALE E. IHLENFELDT, Bankruptcy Judge.

The two debtor corporations may be considered as a single entity (Tinti). They filed under chapter 11 of the Bankruptcy Code on April 21, 1983, and the two cases have been consolidated substantively. Tinti has moved the court for an order pursuant to s. 365(d)(2) to reject the executory contract between Tinti and the Carpenters' District Council of Milwaukee County and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Union). The Union opposes the motion. An evidentiary hearing was held at which the following facts appeared.

For nearly 20 years, Tinti has been doing business as a carpenter contractor, primarily in Waukesha County. Tinti was formed by Jerome Tinti and his brother in the late 1960's, and has been owned and directed by Jerome and his wife, Nancy, since 1970. During the past three years, Tinti has employed from 8 to 12 carpenters. About 95% of its business is the construction of single family homes, the balance being multi-family construction and remodeling jobs. In June, 1982, the Allied Construction Employers' Association, Inc., of which Tinti is a member, entered into a collective bargaining agreement with the Union for the period from June 1, 1982 to May 31, 1984.

Tinti's financial reports reflect the deep slump which has affected the home building industry during the past several years. Its tax returns for the past three years show the following:

| Year | Gross Receipts | Taxable Income |
|------|---------------|----------------|
| 1980 | $218,529 | ($ 9,098) |
| 1981 | $239,264 | $ 4,151 |
| 1982 | $148,702 | ($27,057) |

Despite surface appearances, Tinti has suffered sharply increasing losses in each of the three years shown. The 1981 figures are distorted by the fact that Tinti's returns are filed on a cash basis, the gross receipts and taxable income being enhanced by moneys collected for work done in 1980, and the taxable income being further increased by the reduction in cash outlay for expenses

in 1981 because of reduced construction activity.

Jerome Tinti has been in the carpentry business for the better part of 30 years, first as an employee, then as a subforeman or foreman, and finally as owner-operator of his own business, Tinti. He has been a union member for 20 years, has always employed union members, and has always been a party to collective bargaining agreements. He looks for jobs for Tinti, does the bidding on jobs, turns in bills for expenses, and collects the money for work done. Nancy Tinti answers the phone, does the bookkeeping and pays the bills. Total payments to Jerome and Nancy Tinti of any kind from Tinti during the past three years were:

| Year | Jerome Tinti | Nancy Tinti |
|------|-------------|-------------|
| 1980 | $14,857.10 | $1,900.00 |
| 1981 | $ 9,400.00 | $3,938.25 |
| 1982 | $10,960.98 | $1,800.00 |

They testified that, aside from what they received from Tinti, they had no income of any kind, other than the receipt of payments on a land contract. The business is operated out of their home and thus incurs no rent expense. It has survived recently only because of $30,000 in personal loans from Mr. and Mrs. Tinti, to-wit, $10,000 on 8/20/82, $10,000 on 1/26/83 and $10,000 on 3/16/83. They are now out of money and unable to make any further advances to Tinti.

Tinti's business suffered in the recent past by reason of being underbid by non-signers of the Union contract, although also on at least one occasion by a Union contractor. As a result, it lost a lot of homebuilding jobs, and unless it could become more competitive by lowering its bids, it could not continue in business.

Jerome Tinti did what he could to cut expenses by shopping around, and testified that there was no place where he could cut out of pocket expenses any further—that he could not pay less for supplies, materials, repairs to equipment and the like. This left only labor costs, and so he went to the president of the Union and asked for modification of the collective bargaining agreement. He was told it could not be done. In his efforts to save his business, he then established Brooke Construction, Inc. (Brooke) on or about February, 1983. This was admittedly done for the purpose of evading the terms of the collective bargaining agreement. Brooke is the successor in interest and alter ego of Tinti Construction Company, Inc., the two companies having common family ownership and control, business purposes, location, suppliers, equipment, employees and customers. When another contractor complained that Brooke was underbidding on contracts, the Union filed unfair labor practice charges against Tinti on February 23, 1983, and the National Labor Relations Board, after investigation, issued a complaint against Tinti for unfair labor practices. Tinti did not answer and is in default. Instead, it filed under chapter 11 on April 21, 1983 and moved to reject the executory contract with the Union that same day.

The Union's position is that if Tinti is permitted to reject the contract and continue as a non-union builder, it will be taking business away from union contractors and jobs away from union members. The Union business representative, Gregory Shaw, testified that some 43 builders had subscribed to the Union contract, possibly more, and that there were about 2300 union members. He could not say how many non-union residential contractors might be operating in the four county area covered by the contract, but "there could be a lot of them." He estimated that in 1982 about 40% of residential construction in that area was lost to non-union contractors.

Looking to the future should the contract be rejected, Jerome Tinti acknowledged Tinti's obligation to bargain in good faith with the Union, but testimony from both sides showed clearly this would be an exercise in futility. Shaw said the Union could not possibly enter into a special agreement with one employer (a "sweetheart" contract) and thereby permit it to evade the union contract. The Union could change the contract only by changing it for all employers. He said that if the contract is rejected, the Union will picket. Jerome

Tinti felt that despite such picketing, Tinti could still get jobs. He said that he was known in the trade, had a good reputation, and that he had never seen the Union close down a non-union job site. Shaw said that the Union was presently picketing a number of locations, and that in the past, picketing had driven non-union companies off the job. He acknowledged that the Union was not in a position to and did not picket all non-union job sites, but it is almost a certainty that the Union would picket Tinti in order to discourage other signatory contractors from making similar attempts to be relieved of the contractual obligations. Shaw said that until now none of the other employers had complained about the contract or requested renegotiation. Shaw also pointed out that Tinti did sub-contracting work, and that a picket line would be honored by the union employees of a principal contractor.

In addition to Tinti and the Union, Tinti's employees have a vital interest in these proceedings. Long time union members, they contacted the Union in January, but the Union could not find other work for them, and although it meant a reduction in benefits from those provided by the union contract, they stayed with Tinti when its operations were taken over by Brooke. Their deep concern is for their jobs, and two of them testified in support of Tinti's request to reject the contract. Despite the reduced benefits and the imposition of certain penalties which would be imposed by the Union, the evidence indicates that they would continue to work for Tinti should the contract be rejected.

Again looking to the future, and turning to the other side of the coin, it is practically a certainty that if the contract is not rejected, Tinti will shortly be out of business.

The Union has argued that a collective bargaining agreement is not an executory contract subject to rejection under s. 365, or that it is an executory contract which is excepted from the provisions of that section. The courts, however, have consistently held that collective bargaining agreements are not immune from rejection under

s. 365. "The impact of rejection of a collective bargaining agreement on the rights of workers and the favored status these rights have been accorded by Congress, however, require a more stringent examination of the evidence offered to justify rejection of such a contract." *In re Bildisco*, 682 F.2d 72, 79 (3rd Cir.1982), *cert. granted* —— U.S. ——, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983).

These cases place "the statutory policies underlying Chapter 11 in tension with our national labor policy, as expressed in the National Labor Relations Act. Broadly stated, that policy is to promote industrial peace by facilitating collective bargaining. Sections 7 and 8 of the NLRA, 29 U.S.C. ss. 157 and 158, guarantee the rights of workers to organize and to bargain collectively and protect both employees and employers from unfair labor practices that undermine these rights." *In re Bildisco, supra* at p. 77.

A variety of tests have been formulated for determining whether or not to permit rejection of a collective bargaining agreement. There is the "business judgment" test, that is, whether the executory contract is burdensome to the estate. *Group of Institutional Investors v. Chicago Milwaukee St. Paul & Pacific R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943). A more stringent test, the "balancing of equities" test, is that stated in *Bildisco*. The court in *Bildisco* stated:

> "We are satisfied that [*Shopmen's Local Union No. 455 v.*] *Kevin Steel* [519 F.2d 698, 2nd Cir.1975] isolated from its illegitimate progeny, provides the appropriate framework for an intelligent and equitable approach to the problem because it gives collective bargaining agreements a measure of protection beyond that available under the business judgment test without unduly advancing the interests served by the Labor Act over the other interests of the employees and those of the debtor's other creditors. We believe that the debtor-in-possession must first demonstrate that the continuation of the collective bargaining agreement would be burdensome to the estate; that once this threshold determination has been made

the debtor-in-possession must make a factual presentation sufficient to permit the bankruptcy court to weigh the competing equities; that the polestar is to do equity between claims which arise under the labor contract and other claims against the debtor; that, in this, the court must consider the rights of covered employees as supported by the national labor policy as well as the possible 'sacrifices which other creditors are making' in the effort to bring about a successful reorganization, *Group of Institutional Investors,* 318 U.S. at 550 [63 S.Ct. at 742] and that the court must make a reasoned determination that rejection of the labor contract will assist the debtor-in-possession or the trustee to achieve a satisfactory reorganization. We believe that particularly in a time of economic uncertainty and distress an analysis following this pattern provides more protection to both employer and employee than the test urged upon us by the union and the NLRB."

The "onerous and burdensome" test was stated in *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express,* 523 F.2d 164 (2d Cir.1975), *cert. denied* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388. In that case, the court said that rejection should be permitted "only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs."

As noted earlier, if the contract is not rejected, Tinti is almost certain to be out of business very quickly, so that if the *REA Express* test were to be applied, Tinti should be permitted to reject the contract. The same is true with respect to the "business judgment" test. The court is of the view, however, that in its efforts to resolve the competing and conflicting policies of the bankruptcy law and the labor law, it must be guided by other considerations.

The fact that Tinti's tax returns are filed on a cash basis illustrates the manner in which Mr. and Mrs. Tinti have operated what amounts to little more than a "Mom and Pop" type of business. Unlike many contractors, they did not pay the bills from the last job with the receipts from the next. When the bills came due, they paid them, and this did not change in any way when they shifted to the "Brooke" label. The schedules reflect and the testimony confirmed that there are no outstanding claims other than those of the Union for contributions to employee benefit plans and unpaid wage differentials. As of the date of the hearing, all other bills were current or had been paid.

"The purpose of the reorganization or arrangement case is to formulate and have confirmed a plan of reorganization or arrangement for the debtor." H.R.Rep. No. 95–595, 95th Cong. 1st Sess 221 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6180. Whether discussed in terms of "good faith" or otherwise, the validity of purpose in a particular case is a proper subject for concern. In this case, the sole purpose for filing under chapter 11 was to save the business by enabling rejection of the union contract. In that respect, it should be emphasized and the court finds specifically that the actions of the Tinti's in setting up "Brooke" and filing this chapter 11 case were in no way whatsoever motivated by animus toward the Union. This is not a "union busting" case—it is a case in which the Tinti's are trying to save their business.

If the Union contract is not rejected, Tinti will almost certainly fail, and its 8 to 12 employees will be out of a job. If the contract is rejected, in view of the deeply depressed state of the housing industry and the threatened picketing by the Union, the prospect is not much better for Tinti or its employees.[1] As the court sees it, having in

1. The Union has made the argument that if there is no hope for the debtor to escape liquidation even if the collective bargaining agreement is rejected, the application should be denied because the reorganization's success is not contingent upon rejection. No mention has been made by either party of the problem the debtor would face in attempting to gain the acceptances needed for confirmation from the Union, the only creditor in the case and accordingly, the only one with a vote.

mind the two important and competing statutory policies, the predominant issue is whether the court should permit the rejection of a collective bargaining agreement in a chapter 11 case which was filed for that sole purpose and not for purposes of reorganization. The court finds that this is not a proper use of chapter 11 and that the debtor's request for an order approving rejection of the collective bargaining agreement must be denied.

No findings or conclusions are made with respect to these matters, but the fact that the Union would accept nothing less than full payment serves once again to emphasize the singleness of purpose in the filing of the chapter 11 case.